

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

11 CV 1008

JUDGE CROTTY

RECEIVED
FEB 14 2011
U.S.D.C. S.D.N.Y.
COMPLETED

| | |
|---|---|
| HUGO CRUZ, on behalf of himself and all others similarly situated, | : |
| Plaintiff, | : |
| vs. | : |
| FXDirectDealer, LLC (FXDD), | : |
| Defendant. | : |

Index No.:_____
Part: _____
Justice: _____

**CLASS ACTION COMPLAINT**
[1] CIVIL RICO: 18 U.S.C. § 1962(c)
[2] VIOLATION OF NEW YORK
    GENERAL BUSINESS LAW 349(h)
[3] VIOLATION OF NEW YORK
    GENERAL BUSINESS LAW 350
[4] BREACH OF CONTRACT
[5] BREACH OF IMPLIED COVENANT OF
    GOOD FAITH AND FAIR DEALING

**DEMAND FOR JURY TRIAL**

Plaintiff, HUGO CRUZ (hereinafter, "Plaintiff" or "Cruz"), on behalf of himself and all others similarly situated, sues Defendant, FXDIRECTDEALER, LLC (hereinafter, "Defendant" or "FXDD"), and alleges:

## INTRODUCTION

1.      Plaintiff, Hugo Cruz, just like thousands of other customers, was lured into transacting business with Defendant, FXDD, buying and selling foreign currencies in what is known as the foreign exchange ("Forex") market, but little did Cruz, or any of the others, know that FXDD intended to, and did, systematically bilk them out of their account money through an elaborate scheme of fraudulent tricks, devices, and artifices. What was represented to Cruz and others as a foreign currency trading platform developed upon professed principles of "transparent pricing" which was supposedly rooted in the desire to allow the customer to "maximize trading profits," totally devoid of dealer intervention and market manipulation, was in truth a platform predicated upon

deceit and trickery that systematically looted the accounts of customers who, like Cruz, placed their trust in FXDD.

2.      The scheme deployed by FXDD was complex and varied, utilizing aggressive and pervasive marketing and advertising campaigns, including television, internet, seminars, webinars, and other media, portraying FXDD as a foreign currency trading platform where customers could trade foreign currencies in a true market environment.  The advertisements were specifically targeted to convey a sense of trust and transparency to potential FXDD customers and to gain the customers' confidence in FXDD's trading platforms.  To further bolster customers' confidence in its platform, FXDD enticed customers to use FXDD's practice or demo account (hereinafter, the "Demo Account") to simulate an FXDD trading experience.  But the Demo Account, just like the myriad advertisements, misled customers about the true nature, functionality, and performance of the platform. Once lured into opening an account, customers were subjected to a staggering array of stratagems and ploys, some using extremely sophisticated computer software based upon complex algorithms and high-speed computers, to deceive the customers into believing that their trading was being affected by normal market forces, while in reality Defendant traded against its own customers.

3.      And the so-called "Demo Account" – which was held out by FXDD as the sine qua non to persuade prospective customers to trade with FXDD – was the most cunning and crippling canard of all.  By trading through the "Demo Account" without being at financial risk, the customer was allowed to experience direct market pricing, free from FXDD's interference or manipulation.  The switch pulled by FXDD on how trading occurs once the customer opens a "live" account and starts trading with real money, is

nothing short of a modern-day equivalent of the classic street con game known as "Three-card Monte." Once "live" trading began, direct market pricing was replaced by profound dealer interference and trade manipulation.

4.      To further its fraudulent practices, FXDD associated with software developers and programmers to create and deploy one of the most sinister software applications ever imagined, the central component of which included a back-end administrative console that provided FXDD an arsenal of system commands to facilitate FXDD's fraud on customers. For example, through this console, FXDD can prevent the customer from closing out a profitable trade; hold up a trade so that FXDD can pirate the profit by trading against the customer; or manipulate the price of the market by utilizing "flash" trades to artificially move a market to close out a customer's "stop order." FXDD deployed these technological tricks to separate customers, like Cruz, from their money.

5.      Accordingly, Plaintiff brings the present class action pursuant to Federal Rules of Civil Procedure 23(a), 23(b) (2) and 23(b) (3), seeking monetary, declaratory, and injunctive relief for himself and the class he seeks to represent, consisting of all individuals in the United States who have been victimized by Defendant's false and deceptive trade practices, and fraudulent, unfair trade execution and account handling practices.

## JURISDICTION AND VENUE

6.      This action arises under the laws of the United States, in particular, the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq.

Accordingly, this Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, 18 U.S.C. § 1964, and 18 U.S.C. § 1961 et seq.

7.      This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a) as those claims are so related to the federal claims in this action that they form part of the same case or controversy.

8.      This Court has further jurisdiction over the parties and the subject matter of this class action pursuant to 28 U.S.C. § 1332(d) because (a) there is diversity of citizenship between at least one member of the class and Defendant, and (b) the amount in controversy exceeds $5 million, exclusive of interest and costs.

9.      Venue is proper in this district pursuant to 18 U.S.C. § 1965(a) and U.S.C. § 1391(a) because a substantial part of the events and omissions giving rise to this action occurred in this district and because Defendant transacts business in this district. Furthermore, venue is proper in this Federal District because Defendant is deemed to reside in this Federal District pursuant to 28 U.S.C §1391(c).

## PARTIES

10.     Plaintiff, Hugo Cruz, is a natural person, and at all times relevant to this complaint resided in Springfield, Virginia.

11.     Defendant, FXDD, is a self-proclaimed global online provider of off-exchange foreign exchange (Forex) trading and related services to retail, institutional and individual customers worldwide.    FXDD is incorporated in Delaware and is headquartered at 7 World Trade Center, 32nd Floor, New York, NY 10007.

## FACTUAL BACKGROUND

12.    At all times material hereto, Plaintiff was an individual residing in Springfield, Virginia, and was a customer of Defendant, FXDD.

13.    Defendant, FXDD, is a registered Futures Commission Merchant ("FCM"), a registered Retail Foreign Exchange Dealer ("RFED"), and a Forex Dealer Merchant ("FDM"), as those terms are defined by the National Futures Association ("NFA").  Defendant is a regulated member of the NFA.

### *The Foreign Exchange Market*

14.    The Forex market is a worldwide, off-exchange financial market for the trading of currencies, which began in the 1970s and is currently the largest and most liquid financial market in the world.  The primary purpose of the foreign exchange market is to assist international trade and investment by allowing businesses and individuals to convert one currency to another currency.  To support these transactions, financial centers around the world function as anchors of trading between a wide range of different types of buyers and sellers.

15.    Forex trading functions much like the over-the-counter market for stocks. That is, Forex trades do not take place on a regulated exchange, and there is no central marketplace for buyers and sellers to clear their trades.   The primary participants in Forex trades are large institutional investors who trade with each other in what is known as the inter-bank market.  Within the inter-bank market, Forex trades are executed with narrow spreads, meaning that there is a negligible difference between the bid and ask prices.

16.     Investing in the foreign exchange market was initially within the exclusive purview of these large institutional investors such as pension funds, insurance companies, mutual funds, hedge funds, investment banks, and multinational corporations. However, over the past ten years or so, due to growth of the internet and on-line trading systems, it has become possible for individual investors to trade in the off-exchange foreign currency market. Individual investors can now do so by participating indirectly in the Forex market through a dealer counterparty, or retail broker, such as Defendant. Retail brokers are often referred to as "market makers" because they make their own market and fix the prices they offer to individual traders or customers.

*Defendant's Marketing Practices*

17.     Defendant aggressively promotes itself and its products through television, internet, direct mail, seminars, webinars, and other advertising media, for the purpose of attracting individuals to sign up as customers, and for the purpose of inducing customers to actively trade foreign currencies using its electronic trading platforms.

18.     To attract customers to open accounts and use its trading platforms, Defendant employs an aggressive sales and marketing campaign touting its transparency, its speed of trade execution, and its fair business practices. This marketing campaign has spanned many years and continues to this day, and includes internet and direct mail advertising, as well as seminars, webinars, and other marketing media. In addition, Defendant has used, and continue to use, a wide network of "Introducing Brokers" to refer customers to it for a fee or commission, and has provided, and continues to provide, financial rewards to the various designers of its trading platforms for directing customers to Defendant.

19.    Also as a part of its aggressive sales and marketing strategy, Defendant offers the use of a "Demo," "Paper Trading," or "Practice" Account (collectively referred to hereinafter as the "Demo Account") whereby potential customers can try out Defendant's trading platforms and Application Programming Interface ("API"), purportedly simulating actual trading activity but without risking real money. Defendant represents that the Demo Account will mirror actual trading conditions and would function as a training tool simulating real-world trading conditions.   For example, according to the FXDD Customer Agreement, in order to trade on FXDD's platform, the customer must acknowledge that he or she "has conducted simulated trading using the [FXDD] Demo Trading Platforms or such other platform as FXDD shall make available for a period that has allowed the Customer to develop a full understanding of the FXDD Internet Trading Platforms or such other platforms as FXDD shall make available for online trading of Spot Foreign Exchange real-time trading."  Further, Defendant touts on its website that, "[t]he demo accounts are a great way to get a feel for – live trading. We want customers to feel comfortable trading in our platform before placing real money in an account." "The demo accounts for both platforms mirror exactly what you will see if you sign-up for a live account, and [t]he pricing and spreads are the same in demo and in live accounts."[1]

20.    Defendant has also marketed to customers that it would provide a straight through process ("STP") model of trading for the customer, noting "[t]hrough our proprietary Straight Through Processing (STP) dealing engine, we seamlessly take interbank liquidity and pass it on to our clients. By applying this business philosophy it

---

[1] http://www.fxdd.com/en/learning-center/faq/demo-account.html#4

allows us to focus on facilitating our customers' trading orders, not on depleting our customers' trading accounts by trading against them."[2]

21.     In addition, Defendant promotes itself as having "[t]ransparent and consistent interbank pricing and liquidity,"[3] and "transparent pricing that allows [individual traders] to maximize [their] trading profits,"[4] with "real-time margin monitoring capability in [its] unique, easy-to-read format…[because it]… believe[s]…[its]…[customers] need to know exactly where they stand in real time so that educated trading decisions can be made."[5] In addition, Defendant notes that it "is a fully redundant and secure application…which…was built with the latest technology to insure that you can enjoy uninterrupted service 24 hours a day."[6]

22.     In actuality, Defendant engages in a series of dishonest trade execution practices that are never disclosed to customers. While Defendant's marketing materials represent that Defendant will provide customers with fair trade execution, where gains and losses are determined by the skill of the trader and genuine movement of the market, Defendant's dishonest trade execution practices are designed to cause a customer to lose money no matter how skillful the customer may be in executing trades. Furthermore, the trading experience the customer receives using the Demo Account is not at all like the trading experience the customer receives when using Defendant's actual trading platforms or APIs as Defendant's actual trading platforms are a "rigged game," which has

---

[2] http://web.archive.org/web/20050105014105/http://www.fxdd.com/
[3] http://web.archive.org/web/20070104043807/http://fxdd.com/index.html
[4] http://web.archive.org/web/20061230092523/fxdd.com/benefits_fxdd.html
[5] *See* http://web.archive.org/web/20061225125139/fxdd.com/about_fxdd.html,
http://web.archive.org/web/20070425205911/www.fxdd.com/about_fxdd.html,
http://web.archive.org/web/20070111125634/fxdd.com/about_fxdd.html
http://web.archive.org/web/20070213185027/www.fxdd.com/about_fxdd.html
[6] *See* http://web.archive.org/web/20061230092523/fxdd.com/benefits_fxdd.html,
http://web.archive.org/web/20071010071352/http://www.fxdd.com/ and
http://web.archive.org/web/20071227183917/www.fxdd.com/trading-benefits.html

been designed by Defendant, and its middleware/software developers, to allow Defendant to interfere with and manipulate customers' trades so as to systematically "loot" Defendant's customers' accounts through its dishonest trading practices.   Thus, Defendant deliberately misleads prospective customers by giving them a false impression of the trading experience the customer can expect when using a "Live" Forex trading account (hereinafter, the "Live Account").  In addition, contrary to Defendant's representations of providing straight through processing, Defendant does not rout its customers on a Straight Through Process.  Instead, Defendant keeps accounts in-house so it can trade against the customer and employ the unconscionable tactics to systematically loot the customer's account.

23.     Defendant further deceives customers by failing to disclose its dishonest practices in its disclaimers contained in Defendant's customer agreements. Buried in the fine print of Defendant's lengthy, misleading, contradictory, and largely incoherent computer-generated customer agreement, Defendant purports to innocuously "disclose" and "disclaim" to the customer that any and all transactions are made and entered into by FXDD as the "Principal," and not as broker, intermediary, agent, and advisor or in any fiduciary capacity.  These innocuous disclosures and disclaimers further note that FXDD is acting as a counterparty in these transactions with interests that may be in conflict with the interests of its customers, and that the prices offered by FXDD might not be the best prices available, although it claims that all orders are undertaken by FXDD on a "Best Efforts Basis."  In fact, Defendant does not act as a "principal" in a "market" at all; rather, Defendant acts as a well-armed and unscrupulous adversary to its customer, with superior knowledge, a technological advantage, one which ignores its own contractual

promise to execute trades on a "Best Efforts Basis," and one which intentionally defrauds unwitting customers.

*Defendant's Trading Platforms*

24.     Defendant's trading platforms or APIs consist of several integrated parts. First, the front-end, or user interface, that must be downloaded and installed on the customer's individual computer.  Unseen by the customer, Defendant's trading platforms or APIs also consist of back-end software that receives customer orders, provides customers with pricing information, executes trades, and otherwise provides all of the various features and functions Defendant makes available to its customers.  In the middle of these platforms is "middleware," which is designed to, among other things, translate the information provided by the client into a form usable by Defendant's back-end software and to provide pricing and trading information from Defendant's back-end software in a form usable by the customer's software.

25.     Defendant has engaged the services of various software companies, as well as the services of individual software programmers, to modify the various components of its trading platforms or APIs to allow it to engage in the dishonest trading practices described below.

26.     Defendant has worked with these software companies and individual software programmers to modify its back-end systems and middleware to enable it to engage in the dishonest trading practices described below.  Defendant has modified its trading platforms and APIs so that many of these dishonest trading practices are applied to a customer's account by automated computerized algorithms.   Through this association, Defendant has also modified its trading platforms to include a sophisticated

back-end administrative console that provides Defendant and its employees a series of system commands, each accessible through a drop down menu, designed to execute many of the dishonest trading practices described below. All of these software modifications have been implemented by Defendant to prevent customers from making money and to cause customers to lose money to Defendant.

*Defendant's Dishonest Trading Practices*

27.     Defendant's dishonest trading practices include, but are not limited to, the following:

a.  **Slow Server Command:**  When a customer is engaged in profitable trading activity, Defendant routes the customer's account to a "slow server," causing trade execution to be slowed down, and allowing Defendant the time to hijack any potential profit in the trade by buying and selling in-between the customer's order and the real market, with Defendant's taking any profit and leaving the customer victimized;

b.  **False "Error" Messages:**  Defendant uses its administrative back-end software to prevent the customer from closing out a profitable trade and instead causes the trading platform to generate any one of a series of "error" messages to the customer, blocking the customer's efforts to finalize what would have been a profitable trade;

c.  **Flash Trades:**  Defendant, in a practice known as "stop hunting," manipulates the market price of the traded currency, including printing bogus "flash trades" which move the "market" to trigger the customer's

stop order for a given trade, essentially closing the customer out of that
trade;

d. **<u>Arbitrary Margin Rules:</u>**   Defendant arbitrarily changes the margin
rules on Fridays for an ensuing week without any notice to the customer,
which results in the customer's being deprived of any trading advantages
or leverage opportunities he or she may have, and again causing the
customer's account to be closed out in favor of Defendant;

e. **<u>Abuse of "Slippage":</u>**   Defendant, in a practice known as "slipping a
trade," takes advantage of "slippage" in a given trade.  "Slippage" is the
change in price between the time when a price is quoted and a market
order is placed.  It is customarily caused by market movement while the
trade is being executed. The incidence of "slippage" should roughly be
equal in favor of the customer and the broker.  Defying all laws of
probability, in almost every case, Defendant's customers suffer losses as a
result of "slippage" at grossly greater percentages than Defendant does,
which can only be explained by Defendant's manipulation of pricing; and

f. **<u>"Slow Fill" and "No Fill" Commands:</u>**   Defendant often fails to execute
valid and profitable trade orders entered by the customer and instead
causes the trading system to generate a "slow fill" or "no fill" message to
the customer as the customer attempts to close out a profitable trade,
preventing the customer from making a profit while generating illicit
profits for Defendant.

*The Harm to Consumers*

28.    Defendant has used the above-described methods to systematically misappropriate hundreds of millions of dollars from hundreds of thousands of unsuspecting customers, including Plaintiff herein, and the class of individuals he seeks to represent.  As a direct and proximate result of this massive fraud, Plaintiff, and others similarly situated, including thousands, if not hundreds of thousands, of unsuspecting customers, have suffered damages.

## CLASS ACTION ALLEGATIONS

29.    Pursuant to Rule 23 of the Federal Rules of Civil procedure, Plaintiff, on behalf of himself and all others similarly, situated seeks to certify a national Class defined as follows:

> All persons in the United States who contracted with Defendant to trade foreign currencies on Defendant's over-the counter, off-exchange, trading platforms from January 1, 2005 to present, and whose accounts were subjected to Defendant's fraudulent and unfair trade execution and account handling practices (hereinafter the "Class" or "Class Members").

30.    FXDD is a self-proclaimed leading on-line Forex broker. As a result of FXDD's significant growth over the years, the Class Members are so numerous that joinder is impracticable and would involve thousands, if not hundreds of thousands, of individual actions.

31.    The identities of the individual Class Members are ascertainable through, among other things, Defendant's internal records.  Class Members may be notified of the pendency of the Class Action by numerous reasonable means, including mail, e-mail, internet, publication and other means.

32.     Common questions of law and fact exist and predominate over any issues affecting only individual Class Members.  Common issues of law and fact include, but are not limited to:

a.  Whether Defendant engaged in deceptive or fraudulent acts and practices described herein;

b.  Whether Defendant engaged in conduct actionable under the RICO statute;

c.  Whether Defendant, Plaintiff, and Class Members were and are each a "person," as that term is defined in 18 U.S.C. § 1961(3);

d.  Whether the "FXDD Fraud Enterprise" is an association-in-fact within the meaning of 18 U.S.C. § 1961(4);

e.  Whether Defendant was, and is, a "person" who conducted the affairs of the "FXDD Fraud Enterprise" described below, through the "pattern of racketeering activity" described below;

f.  Whether Defendant has engaged in a "pattern of racketeering activity," as defined in 18 U.S.C. § 1961(5);

g.  Whether Defendant has engaged in "racketeering activity" indictable under any of the provisions of 18 U.S.C. § 1341 (mail fraud) and §1343 (wire fraud), as described below;

h.  Whether Plaintiff and each Class Member were and are each a "person injured in his or her business or property by reason of a violation of" RICO within the meaning of 18 U.S.C. § 1964(c);

i.   Whether Plaintiff and Class Members have been injured in their business or property as a direct and proximate result of Defendant's illegal conduct in violation of 18 U.S.C. § 1962(c);

j.   Whether Defendant is liable for damages to Plaintiff and Class Members for conduct actionable under the RICO statute;

k.   Whether Defendant knowingly and purposely worked with the middleware/software companies, and individual programmers, to create software based upon algorithms designed to allow Defendant to engage in the deceptive and fraudulent acts described herein;

l.   Whether Defendant's scheme to defraud was knowingly made and reasonably calculated with the intent to deceive and defraud persons of ordinary prudence and comprehension, including Plaintiff and Class Members;

m.   Whether Defendant is liable for damages to Plaintiff and Class Members for conduct actionable under New York General Business Law § 349;

n.   Whether Defendant is liable for damages to Plaintiff and Class Members for conduct actionable under New York General Business Law § 350;

o.   Whether Defendant is liable for damages to Plaintiff and Class Members for conduct actionable as a breach of contract; and

p.   Whether Defendant is liable for damages to Plaintiff and Class Members for conduct actionable as breach of the implied covenant of good faith and fair dealing.

33.    Plaintiff's claims are typical of the claims of the proposed Class, and Plaintiff will fairly and adequately represent and protect the interests of the proposed Class.  Plaintiff does not have any interests antagonistic to those of the Class.  Plaintiff has retained competent and experienced counsel in the prosecution of this type of litigation.

34.    Defendant has acted on grounds generally applicable to the Class by engaging in acts of market/account manipulation and an aggressive uniform national marketing and advertising campaign containing false, deceptive, and fraudulent representations, and inadequate disclosures, thereby making injunctive or declaratory relief applicable with respect to the Class as a whole.

35.    A class action is also superior to other available methods for the fair and efficient adjudication of this controversy because Class Members number in the thousands, if not hundreds of thousands, and individual joinder is impracticable. The expense and burden of individual litigation would make it impracticable or impossible for proposed Class Members to prosecute their claims individually.  Trial of Plaintiff's and Class Members' claims is manageable, and economies of time, effort, and expense will be fostered and uniformity of decisions will be insured.

36.    Most individual Class Members have little ability to prosecute an individual action due to the complexity of the issues involved in this litigation and the significant costs attendant to litigation on this scale compared to the damages suffered by individual Class Members.

37.    Unless a class is certified, Defendant will continue to unlawfully engage in acts of market/account manipulation and an aggressive uniform national marketing and

advertising campaign containing false, deceptive and fraudulent representations, and inadequate disclosures.  Unless a class-wide injunction is issued, Defendant will continue to violate the law.

### ACCRUAL, FRAUDULENT CONCEALMENT, CONTINUING VIOLATION AND EQUITABLE TOLLING

38.     Plaintiff and Class Members did not know, and could not reasonably have known, of Defendant's deceptive Forex trading practices described herein.

39.     Defendant's deceptive Forex trading practices were inherently self-concealing, and Defendant has repeatedly elected to continue the concealment of its deceptive practices.

40.     To further the active and fraudulent concealment of this deception, Defendant employed the use of software that has been meticulously and cleverly designed to systematically cause customers to engage in losing currency trades to Defendant, and Defendant has used this technological advantage to essentially steal money from its customers for years.  Defendant knew Plaintiff and Class Members could not obtain information about these deceptive practices.  Defendant's use of this software was undiscoverable to Plaintiff and Class Members, and included, but was not limited to, the following:

     a.   Sending a series of "error" messages to the customer, thereby blocking the customer's efforts to finalize a profitable order;

     b.   Manipulating the market price of the traded currency, including printing bogus "flash trades" that move the "market" to trigger the customer's stop order for a given trade;

c.  Causing the customer to receive a "slow fill" or "no fill" response as the customer attempts to close out a profitable trade;

d.  Routing the customer's account to a "slow server," causing trade execution to be systematically slowed down, and allowing Defendant the time to hijack any potential profit in the trade, by buying and selling in-between the customer's order and the real market, with Defendant's taking all profits, leaving the customer victimized;

e.  Arbitrarily changing the margin rules without any notice to the customer; and

f.  Offering use of the Demo Account described herein, which Defendant deceptively marketed as simulating actual trading activity without risking real money, only to have different results upon funding Live Accounts due to market/account manipulation by Defendant.

41.   Defendant has implemented various methods to avoid detection of its deceptive Forex trading and account handling practices, including through its uniform national deceptive marketing and advertisement campaign in which Defendant has held itself out as a fair and balanced foreign trading "market" when, in fact, Defendant's marketing business practices are nothing more than a scheme to lure unsuspecting customers into a web of deceit so that Defendant can systemically manipulate the market and profit from its deception to the detriment of its customers.

42.   Defendant also employed the Demo Account described herein to actively conceal its deceptive Forex trading and account handling practices. Specifically, after an unsuspecting customer tried the Demo Account, he or she was aggressively marketed by

Defendant to deposit money, and begin trading in the "real market" when, in fact, there was no "real market" and, as soon as the customer began "live" trading, Defendant immediately deployed the cunning and unconscionable tricks described above to systematically steal the customer's money.

43.     Alternatively, if Plaintiff or Class Members were suspecting of Defendant's deceptive Forex trading practices, even in the exercise of due diligence, Plaintiff and Class Members could not have discovered information critical to the claim herein.  Defendant has sole knowledge of its deceptive Forex trading practices, which it actively conceals through misrepresentations in its marketing and advertisements, through use of the Demo Account described herein, and through use of technologically advantageous software meticulously designed to deceive customers, all of which are designed to allay customers' concerns about the trading platforms.  Further, Defendant has never disclosed these deceptive practices to Plaintiff or Class Members, instead, holding itself out as a fair and balanced foreign trading "market" free from market/account manipulation.

44.     Defendant has actively concealed its deceptive Forex trading practices and other wrongful conduct in order to prevent, and indeed has succeeded in preventing, Plaintiff and Class Members from discovering these deceptive practices.

45.     For the reasons alleged above, Class Members are still unaware that they have been and continue to be injured by Defendant's deceptive conduct.

46.     The statute of limitations applicable to any claims Plaintiff or Class Members have brought or could bring as a result of the unlawful and fraudulent concealment and course of conduct described herein has been tolled as a result of

Defendant's fraudulent and active concealment.  In addition, Plaintiff and Class Members did not discover, and could not have discovered, that they had been subjected to actionable misconduct until shortly before the filing of this Complaint, thereby tolling any applicable statute of limitations.  Defendant, through the various devices of concealment and secrecy described above, affirmatively and fraudulently concealed the existence of its unlawful and deceptive Forex trading scheme and course of conduct from Plaintiff and Class Members.  Plaintiff and Class Members had no knowledge of Defendant's scheme and unlawful conduct and did not learn of, or discover, Defendant's fraudulent course of conduct until the filing of this action.

### NAMED PLAINTIFF'S ALLEGATIONS

47.     Plaintiff, Hugo Cruz, entered into a contractual agreement with Defendant in or around September/October 2006 to trade on Defendant's forex platform.

48.     When Cruz began trading on a Live Account, he experienced many of the deceptive practices employed by Defendant, described herein, including, but not limited to, slippage and server delays.

49.     Cruz traded on Defendant's forex platform for approximately two years. During that time, Cruz lost approximately $281,170.24.

### COUNT I
### CIVIL RICO: 18 U.S.C. § 1962(c)

50.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 49 as if fully set forth herein.

51.     This cause of action asserts claims against Defendant for violations of 18 U.S.C. § 1962(c) for conducting the affairs of the "FXDD Fraud Enterprise" described herein, through the "pattern of racketeering activity" described herein.

52.     During the class period, Defendant, Plaintiff, and members of the Class were and are each a "person," as that term is defined in 18 U.S.C. § 1961(3).

53.     During the class period, Plaintiff and each member of the class were and are each a "person injured in his or her business or property by reason of a violation of" RICO within the meaning of 18 U.S.C. § 1964(c).

54.     During the class period, Defendant was, and is, a "person" who conducted the affairs of the "FXDD Fraud Enterprise" described below, through the "pattern of racketeering activity" described below.  While Defendant participates in the FXDD Fraud Enterprise, it has an existence separate and distinct from the enterprise.   Further, the FXDD Fraud Enterprise is separate and distinct from the "pattern of racketeering activity" in which Defendant has engaged and is engaging.

55.     During the Class Period, Defendant was associated with, or operated or controlled, the FXDD Fraud Enterprise, and Defendant participated in the operation and management of the affairs of the FXDD Fraud Enterprise, through a variety of actions described herein. Defendant's participation in the FXDD Fraud Enterprise is necessary for the successful operation of Defendant's scheme.

### The FXDD Fraud Enterprise

56.     Section 1961(4) of RICO defines an "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."

57.     The following persons, and others presently unknown, have been members of and constitute an "enterprise" within the meaning of RICO, which are referred to herein collectively as the "FXDD Fraud Enterprise:"

a.  The Defendant, FXDD;

b.  Tradition (North America) Inc. (Tradition);

c.  Advanced Technologies Group, Ltd (ATG);

d.  James E. Green, the Managing Director and Corporate Councel for FXDD;

e.  Lubomir Kaneti, the COO for FXDD;

f.  The middleware/software companies, and individual programmers, that assisted FXDD in the development of its client-side trading platforms and in the development of modifications to its backend software used to communicate with client side trading platforms that allow Defendant to employ various unscrupulous activities as described herein; and

g.  Introducing brokers, who also participate in the capacity of educational firms that offer books, audio programs, seminars, coaching and software to help consumers profit in forex trading, to whom Defendant paid commissions.

58.     Upon information and belief, ATG formed FXDD as a joint venture with Tradition in 2002, at which time ATG sold the FX3000 trading platform to FXDD for a 25% share in FXDD.[7]   Upon information and belief, Tradition, along with ATG (discussed below), provided financial and professional assistance to FXDD when it was a start-up company.

59.     Upon information and belief, Defendant remains a subsidiary of Tradition. Tradition was formed in 1977 and is a wholly-owned company of Compagnie Financière

---

[7]http://www.thefreelibrary.com/FXDirectDealer,+a+Tradition+Group+Company,+Announces+Joe+Botkier +as...-a0116152625 and http://www.atgworld.com/index.php

Tradition, Switzerland, a world leading broker in over-the-counter financial and non-financial products that was formed in 1959. Tradition historically specializes in over-the-counter markets, and represents itself as having rapidly grown into a fully diversified inter-dealer broker in United States Capital Markets and Foreign Exchange, providing a spectrum of brokerage services to banks, corporations and institutions globally. Tradition is registered with the National Futures Association as the "Principal" of FXDD,[8] but is not independently registered with the National Futures Association.

60.     FXDD has utilized the rich history of Tradition to promote its trading platforms, noting "[FXDD] is a Tradition Group company, a world leader in the brokerage and trading of financial and non-financial products... With [FXDD], Tradition is once again looking to repeat its successes of the past, with a new success for its future. By offering an online foreign exchange product to the small and medium sized investor, it looks to once again fill a void that is in desperate need of filling. Tradition's brokerage history is obviously unmatched. However, with FXDD, and its other businesses, it strives to be more than just brokerage. As a result, FXDD personnel will include seasoned trading and brokerage professionals from the interbank community who understand the FX market, and the technical and fundamental news that make it move one way or the other. Traditions history is about innovation. Tradition is about satisfying needs within the financial community. Tradition is about service. Tradition is about feeling secure in your foreign exchange dealing. There is no known competitor with the tradition of Tradition. So, take a close look at the institution you have your margined trading funds with and ask yourself, 'Do I want to take my risk in the market or with the

---

[8] *See* http://www.nfa.futures.org/basicnet/Details.aspx?entityid=W46a%2bc%2btD4o%3d&rn=N and http://www.nfa.futures.org/BasicNet/Details.aspx?entityid=uclXuQuyCLQ%3d

firm that holds my margined funds?'   With Tradition, you have the corporate reputation, safeguards and history to concentrate that risk, solely on the market - not outside of it!"[9]

61.    FXDD has further marketed itself as being part of Tradition's rich history by touting Tradition as being "a top tier money and foreign exchange broker for the professional interbank community," including that "*no other electronic retail foreign exchange firm can provide such a respected bloodline*,"[10] and that FXDD "is held to the same high standards as [its] parent company, Compagnie Financière Tradition."[11] Defendant's advertisements further note that its "business model is to provide interbank market maker prices to our clients. This is the business model that *Tradition our parent* has been utilizing for over 40 years. By adhering to this model, it allows our clients to take the trading risks while we concentrate on facilitating their trades at the best possible prices. *It allows us to avoid the conflict of interest whereby we put our trading P/L ahead of our clients.* Instead we look to foster a team oriented relationship --clearly separating execution from trading."[12] Further, the hexagon symbol used by FXDD in its logo is a trademark of Tradition.[13]

62.    ATG is a publicly traded company that claims to have been delivering next generation, state-of-the-art technological solutions since 1997.  As described above, ATG, which acquired a 25% equity stake in FXDD in 2002, contributed its FX3000 currency trading platform to the venture. Upon information and belief, in March 2009, ATG sold its equity stake in FXDD to FXDD for $26 million.

---

[9] http://web.archive.org/web/20041231063942/www.fxdd.com/benefits.htm
[10] *See* http://web.archive.org/web/20070111125634/fxdd.com/about_fxdd.html and http://web.archive.org/web/20070213185027/www.fxdd.com/about_fxdd.html.
[11] *See http://web.archive.org/web/20070104043807/http://fxdd.com/index.html*
[12] *See* http://web.archive.org/web/20071227183917/www.fxdd.com/trading-benefits.html and http://web.archive.org/web/20080401125036/www.fxdd.com/trading-benefits.html.
[13] *See* http://www.fxdd.com/en/terms.html.

63.     Lubomir Kaneti is the COO for FXDD.  Upon information and belief, Mr. Kaneti manages day-to-day financial operations of FXDD, including the deceptive and fraudulent trading practices described herein, while deceivingly marketing FXDD as having transparent trading platforms.[14]  As described below, Mr. Kaneti has deceptively marketed FXDD as having no dealer intervention by anyone at FXDD, no third-party middleware to connect its trading platforms to interbank liquidity with trading that does not depend on the trials and errors of a software company, and no virtual dealer server plug-ins.

64.     James E. Green is the Managing Director and Corporate Councel for FXDD.  Upon information and belief, Mr. Green also manages the day-to-day financial operations of FXDD, including the deceptive and fraudulent trading practices described herein, while deceivingly marketing FXDD as having a transparent trading platform.[15]  As described below, Mr. Green has deceptively marketed FXDD as having no dealing desk interference with credible pricing and honest and fair dealing practices.

65.     The "FXDD Fraud Enterprise" is an association in fact within the meaning of 18 U.S.C. § 1961(4) and consists of a group of "persons" associated together for the common purpose of employing the multiple deceptive, abusive and fraudulent acts described herein.  The FXDD Fraud Enterprise is an ongoing organization with an ascertainable structure, and a framework for making and carrying out decisions, that functions as a continuing unit with established duties, and that is separate and distinct from the pattern of racketeering activity in which Defendant has engaged and is

---

[14] http://www.prnewswire.com/news-releases/fxdd-automatically-executes-trades-without-any-intervention-98500469.html
[15] http://www.prnewswire.com/news-releases/fxdd-automatically-executes-trades-without-any-intervention-98500469.html

engaging. The FXDD Fraud Enterprise was used as a tool to effectuate a pattern of racketeering activity.

66.     Specifically, as the leader of the FXDD Fraud Enterprise, Defendant has worked with its directors, Lubomir Kaneti and James E. Green, and its parent company, Tradition, along with independent middleware/software companies, including, but not limited to, ATG, and with various individual programmers, some who are employees of Defendant, and others who are not, to create and deploy automated computerized algorithms in Defendant's back-end software that allows Defendant to implement various dishonest trade execution practices described in this Complaint. Defendant, Lubomir Kaneti, James E. Green, Tradition, ATG, the middleware/software companies, and the individual programmers, have worked together to design, customize, and employ, specialized software applications in Defendant's trading platforms and APIs, which allows Defendant to dishonestly manipulate settings in Defendant's trading platforms and APIs to the detriment of Defendant's customers. Through this relationship among Defendant, Lubomir Kaneti, James E. Green, Tradition, ATG, the middleware/software companies, and individual programmers, Defendant has been able to deliberately and willfully employ dishonest trade execution practices including slippage, re-quotes, and server delays, all for the purpose of gaining profits at the expense of its customers, turning its customers' profitable trades into less profitable trades or complete losses. This conduct is in furtherance of the goals of the FXDD Fraud Enterprise and continues to this day as Defendant, Lubomir Kaneti, James E. Green, Tradition, ATG, the middleware/software companies, and individual programmers, periodically maintain and upgrade the specialized software applications they have designed for use in Defendant's

trading platforms and APIs.

67.    In addition, in furtherance of the goals of the FXDD Fraud Enterprise, Defendant provides financial incentives to the middleware/software companies, and individual software programmers, involved in the FXDD Fraud Enterprise to steer customers to Defendant's rigged trading platforms and APIs. These middleware/software companies, and individual software programmers, are aware that Defendant utilizes the dishonest trade execution practices it has embedded into Defendant's trading platforms and APIs, but nonetheless, attempt to influence individuals to use Defendant's services in an effort to share in the fruits of the FXDD Fraud Enterprise.

68.    At the top of the hierarchy of the FXDD Fraud Enterprise lies its COO, Lubomir Kaneti, and its Managing Director and Chief Legal Councel, James E. Green. Upon information and belief, Mr. Kaneti and Mr. Green are responsible for the day-to-day financial operations of FXDD, including implementation and supervision of the deceptive trading practices described herein.  Mr. Kaneti and Mr. Green also assist in perpetuating the goals of the FXDD Fraud Enterprise by creating and passing on various deceptive and fraudulent statements for repetition by Introducing Brokers, as described below.

69.    Tradition also stands at the top of this hierarchy, having provided not only the start-up capital to FXDD, but also its expertise in over-the-counter forex trading. Tradition assists in perpetuating the goals of the FXDD Fraud Enterprise by using its rich tradition as a world leader in the brokerage and trading of financial and non-financial products to induce trust and reliance by Plaintiff and Class Members to trade on FXDD's deceptive trading platforms and APIs.

70.     ATG has found its place on the hierarchy of the FXDD Fraud Enterprise by providing 25% of the start-up capital to FXDD, and by joining with Tradition to bring FXDD's deceptive trading platforms and APIs to FXDD's consumers.

71.     At the bottom of the hierarchy of the FXDD Fraud Enterprise lie the independent third-party "Introducing Brokers."    Defendant uses the services of Introducing Brokers who are paid commissions or fees to steer customers to Defendant's rigged trading platforms and APIs in furthering the ends of the FXDD Fraud Enterprise. In most instances, the Introducing Brokers are not aware of Defendant's dishonest trade execution practices, but nevertheless, these Introducing Brokers assist in the perpetuation of the goals of the FXDD Fraud Enterprise by bringing additional customers to Defendant.  These Introducing Brokers also assist in perpetuating the goals of the FXDD Fraud Enterprise by predictability passing on and repeating the various fraudulent statements of Defendant, albeit in many instances unwittingly, but nonetheless bolstering the believability of the Defendant's false statements.

72.     The FXDD Fraud Enterprise is an ongoing enterprise that engages in, and whose activities affect, interstate commerce by, among other things, marketing, advertising, selling, or providing its forex trading platforms and APIs to thousands, if not hundreds of thousands, of entities and individuals throughout the United States, as described herein. The FXDD Fraud Enterprise began by at least October 2002 and presently continues to operate as a single continuing unit.

73.     The overarching purpose of the FXDD Fraud Enterprise is for each of its members to profit from customers opening Live Accounts with Defendant.  Defendant accomplishes this goal by defrauding and manipulating customers, stealing money from

those customers, by accepting funds for foreign currency trading and misappropriating those funds, or the proceeds derived therefrom, through the dishonest trade execution practices described in this Complaint.   The middleware/software companies, and individual programmers, as members of the FXDD Fraud Enterprise, accomplish this goal by creating software systems necessary to enable and empower Defendant to engage in the dishonest trade execution practices described in this Complaint, and then sharing in the illicit profits gained thereby.   The Introducing Brokers further this goal by recommending that customers use Defendant's services (and trading platforms) in exchange for compensation.

### B.   Predicate Acts (Mail and Wire Fraud)

74.    Section 1961(1) of RICO provides that "racketeering activity" is, among other things, any act indictable under any of the provisions of 18 U.S.C. § 1341 (mail fraud) and §1343 (wire fraud).

75.    As set forth below, to carry out, or attempt to carry out its scheme to defraud, Defendant has engaged in, and continues to engage in, the affairs of the FXDD Fraud Enterprise through the following pattern of racketeering activity, in violation of 18 §1341 (mail fraud):

a. Defendant, in violation of 18 U.S.C. § 1341, placed in post offices or official depositories of the United States Postal Service matter and things to be delivered by Postal Service, caused matter and things to be delivered by commercial interstate carrier, and received matter and things from the Postal Service or commercial interstate carriers, including, but not limited to, requiring its customers to mail customer agreements to its home office in New

York.    As described herein, these customer agreements included the
following deceptive information, which defendant included in its client
agreements to perpetuate its scheme to defraud its clients:

      i.  In its customer agreements, Defendant included a Risk Disclosure
Statement outlining, among other things, that: (a) FXDD acts as a
counterparty in the subject transactions, which may result in
conflict of interest with its customers, and (b) while FXDD acts as
a "Principal" in all transactions, it may also act as the "opposing
principal broker.

These disclosures fail to express the actual risks attendant with trading on
FXDD's trading platforms and APIs, including the deceptive and fraudulent
market/account manipulation described herein.   Defendant is much more than a mere
"counterparty" or "opposing principal broker."   Defendant acts as a well armed and
unscrupulous adversary to their customers, with superior intellect, a technological
advantage, and a complete lack of moral and ethical underpinning, allowing Defendant to
intentionally defraud the unwitting customer, and the public at large, while hiding behind
auspices of "disclaimers" buried inside a lengthy, cohesive computer generated customer
agreement.

      ii.  The Risk Disclosures further note that (a) liquidity risk is usually
due to unanticipated changes in economic and/or political
conditions and that liquidity risk can be FXDD specific due to
changes in liquidity available to FXDD from FXDD's interbank
liquidity providers or specific to retail foreign exchange market

makers due to a perception that the risks of the market segment has increased, (b) decreases in liquidity can also result in "Fast Market" conditions where the price of a currency pair moves sharply higher or lower or in a volatile up/down pattern without trading in an ordinary step-like fashion, but that FXDD's prices, bid/ask spreads and liquidity will reflect the prevailing interbank market liquidity for FXDD, and that (c) there is a technology risk inherent in trading online or via a software application and the Customer accepts that risk.

These disclosures again fail to express the actual risks attendant with trading on FXDD's trading platform, including the deceptive and fraudulent market/account manipulation described herein.  Contrary to these contentions, the customer's *liquidity risk* extends far beyond *"Fast Market"* situations, "*unanticipated changes in economic and/or political conditions*, or *changes in liquidity available to FXDD from FXDD's interbank liquidity providers or specific to retail foreign exchange market makers due to a perception that the risks of the market segment has increased*." The customers' actual risks include a series of deceptive acts relating to the servers employed by Defendant to adversely affect consumer trades on its forex trading platforms including, but not limited to: (a) routing a customer's account to a "slow server" causing trade execution to be systematically slowed down, allowing Defendant the time to hijack any potential profit in the trade, as described above; (b) preventing the customer from closing out a profitable trade as a result of Defendant and its agents sending a series of "error" messages to the customer, as described above; (c) preventing the customer from closing out a profitable

trade as a result of Defendant's abusive price slippage practices; (d) manipulating the market price of the traded currency, including printing bogus "flash trades" that move the "market" to the customer's stop order for a given trade, essentially wiping the customer out for that trade; (e) preventing the customer from making a profit by failing to execute valid and profitable trade orders entered by the customer; (e) causing the customer to receive a "slow fill" or "no fill" response as the customer attempts to close out a profitable trade; and (f) arbitrarily changing the margin rules without any notice to the customer, which results in the customer being deprived of any trading advantages or leverage opportunities that he or she may have.

> iii. In addition, the Customer Agreements notes that all orders transmitted and accepted by a FXDD representative, are accepted by FXDD and *undertaken on a "Best Efforts Basis."*

This disclosure yet again fails to express the actual risks attendant with trading on FXDD's trading platform, including the deceptive and fraudulent market/account manipulation described herein. In fact, Defendant does not execute orders on a "Best Efforts Basis," at least with the customer's "best" interests in mind as Defendant executes orders on a "Deceptive and Fraudulent Basis" by use of the deceptive and fraudulent market/account manipulation described above.

> b. Defendant, in violation of 18 U.S.C. § 1343, transmitted and received by wire, internet connection, or other electronic media, matters and things relating to its uniform deceptive national advertising and marketing campaign, including the following widespread advertising programs, promotions,

seminars, press releases, "consumer-oriented" statements and advertising within its website, including the Demo Account described herein.

    i.  Upon information and belief, on January 5, 2005, on its website, Defendant advertised itself as providing (a) "**Transparent Real-Time Bid/Offer Pricing, Real Time Price Monitoring**," noting "[f]or the financial professional or other trader in the corporate environment, all of FXDirectDealer's real-time live prices can be followed on Bloomberg, Reuters or Telerate Having access to the live, real-time market on various electronic medians is another way FXDirectDealer proves its professional service and commitment to its clients," and (b) "**FXDirectDealer Does Not Trade Against Their Clients, but Facilitates Trade Via Transparent Real-Time Bid/Offer Pricing…** FXDirectDealer's business model is to seamlessly execute - on a Straight Through Processing basis - client deals at our interbank market makers prices. We do not trade against our clients. We do not 'run' markets in order to execute client pending orders or re-price orders when the client benefits. We do not look to create an adversarial relationship with our clients, but instead look to foster a cooperative relationship that allows our clients to maximize their trading profits at all times."[16]

    ii.  Upon information and belief, from at least February 2005 through July 2005, on its website, Defendant advertised that "[a]t

---

[16] http://web.archive.org/web/20041231063942/http://www.fxdd.com/benefits.htm#Transparent Real-Time Bid/Offer Pricing

FXDirectDealer, we seamlessly take interbank liquidity and pass it onto our clients through our proprietary straight-through-processing (STP) dealing engine. By applying this business philosophy, it allows us to focus on facilitating our customers trading orders, not on depleting our customers' trading accounts by trading against them."

iii. Upon information and belief, on December 27, 2005, Defendant advertised that "FXDirectDealer offers real time prices and deal execution via our API to qualified institutions. The API is designed around our Enterprise Trading System and allows organizations to easily integrate with their existing trading platforms."[17]

iv. Upon information and belief, from at least January 1, 2006 through November 15, 2006, Defendant advertised that "FXDD provides real-time margin monitoring capability in numerical and in our unique, easy-to-read graphical format. We believe that our clients need to know exactly where they stand in real-time so that educated trading decisions can be made,[18] and that it provides "Transparent and consistent interbank pricing and liquidity."[19]

v. Upon information and belief, from at least January 2007 through August 2007, Defendant has consistently advertised FXDD as

---

[17] http://web.archive.org/web/20060105073236/www.fxdd.com/api.htm
[18] http://web.archive.org/web/20051230132303/www.fxdd.com/fxddoverview.htm
[19] http://web.archive.org/web/20060806035302/http://fxdd.com/ and
http://web.archive.org/web/20061207225631/www.fxdd.com/about_fxdd.html

providing "[t]ransparent and consistent interbank pricing and liquidity."[20]

vi. Upon information and belief, in January and February 2007, on its website, Defendant again advertised itself as providing "real-time margin monitoring capability in our unique, easy-to-read format," noting it believed its clients "need to know exactly where they stand in real time so that educated trading decisions can be made."[21]

vii. Upon information and belief, on or about January 2007 through at least December 2008, similar to the above, Defendant advertised itself as providing "Facilities Trade Via Transparent Real-Time Bid/Offer Pricing," noting "FXDD's business model is to provide interbank market maker prices to our clients. This is the business model that Tradition has been utilizing for over 40 years. By adhering to this model, it allows our clients to take the trading risks while we concentrate on facilitating their trades at the best possible prices. It allows us to avoid the conflict of interest whereby we put our trading P/L ahead of our clients. Instead we look to foster a team oriented relationship --clearly separating execution from

---

[20] http://web.archive.org/web/20070104043807/http://fxdd.com/index.html and
[21] http://web.archive.org/web/20070111125634/fxdd.com/about_fxdd.html
http://web.archive.org/web/20070213185027/www.fxdd.com/about_fxdd.html

trading, and that individual investors '[r]eceive transparent pricing that allows [them] to maximize [their] trading profits.'"[22]

viii. Upon information and belief, on October 27, 2007, Defendant advertised that its "market making desk is staffed with experienced FX traders with an average of 20+ years of bank experience. As a result, your trades and orders will be handled quickly and professionally. Market orders are filled instantaneously at the rate you request, with no manual dealer intervention or slippage. You can enter non-market orders inside the dealing spread, and there are no restrictions on leaving orders during times of high market volatility."[23]

ix. Upon information and belief, from at least December 2008 through January 31, 2011, on FXDD's website, Defendant advertised its trading platform as having "Redundant and Secure Applications," noting "FXDD's trading platforms are fully redundant and secure applications. The applications were built with the latest technology to insure that you can enjoy un-interrupted service 24-hours a day. We also employ a multi-level security scheme that protects your information while maintaining confidentiality."[24]

x. Further, in or around December 2010, Defendant advertised FXDD's FXDemo Dollars Holiday Bonus, which took place from

---

[22] http://web.archive.org/web/20080525104506/www.fxdd.com/trading-benefits.html
[23] http://web.archive.org/web/20071027042555/www.fxdd.com/forex-trading-services/institutional-services.html
[24] http://www.fxdd.com/en/forex-trading/why-trade-with-us.html

December 13, 2010 until January 28, 2011. Through this promotion, customers who traded with an FXDD Demo Account were eligible to convert their Demo Account profits into a live account bonus - up to $8,000. The Demo Accounts had $50,000 FXDemo Dollars and employed a 50:1 leverage. Each day during the promotion, clients received an account statement with the option to claim their FXDemo Dollars profits and have them credited as a bonus to the customer's live account. To receive the bonus, a live account must have been opened within seven business days of claiming the FXDemo Dollars and must have been converted to the live account bonus only once during the promotion period.[25]

xi. Further, on or around January 18, 2011, Defendant introduced the *USA vs. Japan FX University Challenge*, a demo contest for college students to learn how the foreign exchange market operates and to compete for a chance to win a trip to New York City and $3,000 in scholarship funds. To participate, students are required to open a Demo Trading Account between January 18 and March 1, 2011 and trade virtual foreign currency, as opposed to trading with real money. In this advertisement, Defendant noted "[t]he Foreign Exchange Market is one of the largest and most liquid markets in the world. Foreign exchange rates are dependent on

---

[25] http://www.fxdd.com/en/demo-dollars.html and http://business-video.tmcnet.com/news/2010/12/13/5191145.htm

many factors, such as a country's fiscal and monetary policy, budget surpluses and deficits, balance of trade, inflation and economic growth. Political conditions and current events, as well as economic reports released by government agencies, can also cause large shifts in currency prices."   Defendant further noted it was "committed to education and support for college students. We hope that participation in the challenge will help students become more sensitive to world events and the political and economic impact on global financial markets." [26]

xii.  Upon information and belief, on or about January 31, 2011, on FXDD's website, Defendant touted itself as providing "Transparent Real-Time Bid/Offer Pricing," noting "FXDD's business model is to provide interbank market maker prices to our clients. This business model allows our clients to take the trading risks while we concentrate on facilitating their trades at the best possible prices. It allows us to avoid the conflict of interest where some firms may put their trading P/L ahead of their clients. Instead we look to foster a team oriented relationship - clearly separating execution from trading," and that individual investors "[r]eceive transparent pricing that allows [them] to maximize [their] trading profits."[27]

---

[26] http://www.fxdd.com/en/about-fxdd/enhanced-company-news/single-view.html?tx_ttnews%5Btt_news%5D=818&cHash=20b3794cd1f7ccc9d0b2d4b64c85131f
[27] http://www.fxdd.com/en/forex-trading/why-trade-with-us.html

xiii.   In addition to advertising through its own website, Defendant also advertises on Facebook, including, among other things, the following: (1) information about FXDD's live education webinars on November 11, 2010, December 7, 2010, January 18 and 27, 2011, and various other dates, with links to FXDD's website; (2) promotions, including, but not limited to, the "Demo Dollars" promotion, which it advertised on December 13, 2010, and on January 10 and 24, 2011, with links to FXDD's website, which is described in further detail above; (3) and various other promotions, including, but not limited to, a May 7, 2010 advertisement linking customers to a advertisement on its website indicating "FXDD brings institutional trading to you," which noted, among other things, that Defendant provides "Unbiased Pricing (No Dealer Intervention)."[28]

xiv.   Defendant also sourced information to PRNewswire.com, including, but not limited to, the following.

1.   According to a PRNewswire.com article on May 12, 2010, with FXDD as the source of information in same, FXDD announced "Institutional Pricing and Platforms to All

---

[28] http://www.facebook.com/people/Fxdd-Trading-Forex/100000504229621#!/FXDDForex?v=wall, citing http://www.fxdd.com/en/about-fxdd/enhanced-company-news/single-view.html?tx_ttnews[tt_news]=584&tx_ttnews[backPid]=3&cHash=38e05fe7f0

Clients," including, but not limited to "Unbiased Pricing (No Dealer Intervention)."[29]

2. According to a PRNewswire.com article on July 15, 2010, titled "FXDD Automatically Executes Trades Without Any Intervention," which referenced information in an open e-mail sent by Lubomir Kaneti, FXDD's COO, FXDD announced the following to the consuming public:[30]

   a. "FXDD does not have manual execution, What does this mean for you? Unless you call to place an order over the phone, all trades you make will be processed and executed automatically by our system without any intervention by anyone at FXDD. Simply put, if we show the price and you trade on it, you have a deal. No asterisks and no fine print."

   b. "FXDD does not use third party middleware to connect MetaTrader 4 to interbank liquidity. What does that mean for you? Your trading does not depend on the trials and errors of a software company that does not serve you, but instead serves the broker or the other side of your trades. If FXDD fails we make you whole, period. That is why we

---

[29] http://www.prnewswire.com/news-releases/fxdd-announces-institutional-pricing-and-platforms-to-all-clients-93593239.html

[30] http://www.prnewswire.com/news-releases/fxdd-automatically-executes-trades-without-any-intervention-98500469.html

like to be in control of our technology. This is why FXDD's MetaTrader 4 consistently performs so well and why FXDD's MetaTrader 4 is preferred by traders who develop automated trading scripts called Expert Advisors; they know they can rely on our experience and service."

c. "FXDD does not use any notorious "virtual dealer" trading server plug-ins. What does that mean for you?  Apparently, this plug-in can be used to allow for manual execution or tweaking the execution parameters on the trading server.  We have never used these plug-ins and we don't plan to ever use them.  And by the way, the NFA knows how to audit for this."  In summary, Mr. Kaneti added that, "FXDD's goal is to offer excellent service and execution to our clients. We offer top-flight service, personal attention and we care about and listen to our customers.  We endorse client education because the more we educate our clients the more informed they will be when choosing which FX dealer they trust and want to do business with."

xv.  Further, James E. Green has publicly promoted FXDD as priding itself on providing honest pricing, credible dealing practices, good

client support and competitive assistance with all matters relating to FXDD customers.  As part of this promotion, in October 2007, Mr. Green provided an e-mail response to an inquiry from MaBiCo.com - forex news guide, business, financial news, regarding the benefits of "no dealing desk interference," noting "the issue is not whether there is a perceived or actual inherent conflict of interest on the part of firms who may accumulate positions.  Our clients want to know that our desk manages client positions with integrity based on honest pricing and fair dealing practices.  Some firms have, rightly or wrongly, developed a reputation as 'stop hunters,' and 'boosters.' Since the dealing firm knows all customer positions, it might be tempted to widen the market or boost the bid or offer just so that it can hit client stops. Later they justify the price change based on a set of objective or subjective parameters. Those firms, to our way of thinking, are not credible dealers and abuse their clients' trust. And firms who are strictly providing liquidity on an STP basis (no dealing desk interference) have the same ability to manipulate the price should they choose to. Professional dealing desks like FXDD's manage risk, execute customer trades when needed and provide constant liquidity to the firm's clients. The bottom line is that clients must always demand credible pricing and honest dealing from their firm

whether it is FXDD or one of the other excellent firms on your site."[31]

None of the above marketing materials expressed the actual risks attendant with trading on Defendant's trading platforms, including the deceptive and fraudulent market/account manipulation described herein.

    c.    Defendant, in violation of 18 U.S.C. § 1343, conducted exchanges, payments and monetary transfers using the wires concerning the receipt and distribution of the proceeds of Defendant's improper marketing scheme.

76.    Defendant's misrepresentations and acts were knowing and intentional, and made with the intent to create and manage its scheme to defraud and manipulate customers by accepting funds for foreign currency trading and misappropriating or manipulating the amounts traded, as described in the Complaint.

77.    Plaintiff and Class Members reasonably relied on Defendant's false statements by continuing to invest money with Defendant and not taking immediate action to close their accounts and demand the return of their investments.

78.    As described below, Defendant's violations of these statutes constitute a "pattern of racketeering activity" because such predicate acts were related to each other in that they were committed as part of an illegal and fraudulent marketing scheme, and an illegal and fraudulent scheme to defraud and steal money from customers by accepting investments for foreign currency futures trading and misappropriating or manipulating the amounts invested, all of which amount to or pose a threat of continued criminal activity.

---

[31] http://www.mabico.com/en/news/20071002/foreign_exchange/articlep90750/

79.     As a direct and proximate result of Defendant's illegal conduct in violation of 18 U.S.C. § 1962(c), Plaintiff and Class Members have been injured in their business or property by the following acts, which include, but are not limited to:

    a.   The theft and loss of the amounts Plaintiff and Class Members invested with Defendant in an amount that will be proven at trial; and

    b.   The consequential damages relating to not receiving the investment return that Plaintiff and Class Members could have obtained from prudent investments in an amount that will be proven at trial.

### C.     The Pattern of Racketeering Activity

80.     As set forth herein, Defendant has engaged in a "pattern of racketeering activity," as defined in 18 U.S.C. § 1961(5), by committing or conspiring to commit at least two acts of racketeering activity, described above, within the past 10 years.

81.     Defendant has engaged in a scheme to defraud consumers, including Plaintiff and Class Members, through fraudulent misrepresentations, knowing concealments, suppressions and omissions of material fact in its Customer Agreements, marketing materials, on its website, and in other advertisements, with the use of United States mails or interstate telecommunication systems for the purpose of executing its scheme.

82.     Defendant's scheme to defraud was knowingly made and reasonably calculated with the intent to deceive and defraud persons of ordinary prudence and comprehension, including Plaintiff and Class Members.

83.     Defendant's scheme to defraud was made with intent to induce reliance by Plaintiff and Class Members upon such misrepresentations, concealments, suppressions, or omissions.

84.     Defendant's scheme to defraud was made with the purpose of gaining hundreds of millions, and potentially billions, of dollars in profits from consumers, including Plaintiff and Class Members, that would not have been gained but for Defendant's acts and omissions alleged herein.

85.     As detailed below, Defendant's fraudulent scheme and conspiracy consisted of, among other things:

    a.  The unlawful promotion and marketing of software designed by Defendant and the middleware/software companies, and individual software programmers it retained, that allows or makes possible the dishonest trade execution practices on FXDD's trading platform, as described in this Complaint;

    b.  The unlawful promoting and marketing of materials and advertisements containing false information, including, but not limited to, the Demo Account described in this Complaint, upon which Defendant used to manipulate and induce reliance on customers, thereby engaging in unethical and illegal behavior to gain profits from its customers;

    c.  Embarking on an aggressive sales and marketing campaign, through television, internet, seminars, the Demo Account described in this Complaint, and other advertising media, through which Defendant misrepresented that an average person, without any particular training or

expertise, could experience and enjoy substantial profit and financial gain by trading foreign currencies using Defendant's software when, in actuality, unlike Live Accounts, the Demo Accounts are not subjected to intervention and market manipulation by Defendant, and Live Accounts are subjected to the dishonest trade execution practices described in this Complaint;

d.  Embarking on an aggressive sales and marketing campaign, through television, internet, seminars, and promotion of the Demo Account described in the Complaint, and other advertising media, for the purpose of inducing new and existing customers to actively trade foreign currencies on Defendant's deceptive trading platforms so Defendant could employ the dishonest trade execution practices described in the Complaint;

e.  Deliberately misrepresenting, and causing others to misrepresent, or concealing, and causing others to conceal, that unlike Live Accounts, the Demo Account described herein was not subjected to intervention and market manipulation by the FDM/FCM;

f.  Deliberately misrepresenting, and causing others to misrepresent, or concealing, and causing others to conceal, the following deceptive acts relating to the trading software employed by Defendant, through its website, to adversely affect customer trades on the Forex trading platforms:

i.   Routing a customer's account to a "slow server" causing trade execution to be systematically slowed down, and allowing Defendant the time to hijack any potential profit in the trade, by buying and selling in-between the customer's order and the real market, with Defendant taking any profit, and leaving the customer victimized;

ii.  Preventing the customer from closing out a profitable trade, as a result of Defendant and its agents sending a series of "error" messages to the customer, thereby blocking the customer's efforts to finalize a profitable order benefiting Defendant to the detriment of the customer;

iii. Preventing the customer from closing out a profitable trade, as a result of Defendant's abusive price slippage practices, benefiting Defendant to the detriment of the customer;

iv.  Manipulating the market price of the traded currency, including printing bogus "flash trades" that move the "market" to the customer's stop order for a given trade, essentially wiping the customer out of that trade, benefiting Defendant to the detriment of the customer;

v.   Preventing the customer from making a profit, and failing to execute valid and profitable trade orders entered by the customer, benefiting Defendant to the detriment of the customer;

vi.  Causing the customer to receive a "slow fill" or "no fill" response as the customer attempts to close out a profitable trade, benefiting Defendant to the detriment of the customer; and

vii. Arbitrarily changing the margin rules without any notice to the customer, which deprives the customer of any trading advantages or leverage opportunities that he or she may have had, benefiting Defendant to the detriment of the customer.

86.    The above-described racketeering activities amount to a common course of conduct intended to deceive and harm Plaintiff and Class Members. Each such racketeering activity is related, has a similar purpose, involves the same or similar participants and methods of commission, and has similar results affecting similar victims, including Plaintiff and Class Members.  These acts pose a threat of continued racketeering activity and constitute a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).

87.    Many of the precise dates and times of Defendant's violations of the above-referenced statutes are not known. Indeed, an essential part of the successful operation of the illegal sales and marketing scheme alleged herein depended upon secrecy and Defendant took deliberate steps to conceal its wrongdoing.  However, given the massive scope of the illegal and fraudulent scheme, Defendant likely committed thousands, if not millions, of predicate acts of "racketeering activity."

88.    Defendant's violations of the above laws, and the effects thereof detailed above, are continuing and will continue. Plaintiff and Class Members are and continue to be injured in their property by reason of these violations in that Plaintiff and Class

Members have traded, and continue to trade, on Defendant's Forex trading platforms, which trades would not have been made had Defendant not conspired to violate 18 U.S.C. § 1962(c).

89.     Plaintiff's and Class Members' injuries are directly and proximately caused by Defendant's racketeering activity as described herein.

90.     Plaintiff and Class Members have standing to sue Defendant under 18 U.S.C. § 1964(c) and to recover compensatory damages, treble damages, and the costs of suit, including reasonable attorneys' fees.

91.     In addition, Plaintiff and Class Members are entitled to declaratory and injunctive relief, pursuant to 18 U.S.C. § 1964(a), to remedy and prevent Defendant from engaging in further violations of federal law.

92.     Upon information and belief, there have been numerous other predicate acts by Defendant that are presently unknown to Plaintiff and Class Members.

## COUNT II
## VIOLATION OF NEW YORK GENERAL BUSINESS LAW 349(h)

93.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 49 as if fully set forth herein.

94.     As described herein, Defendant has engaged in unfair or deceptive acts or practices in the conduct of business, trade or commerce, or in the furnishing of services, that resulted in injury to Plaintiff and Class Members.

95.     Defendant has concealed, continues to knowingly conceal, and caused others to conceal, and has knowingly misrepresented, and caused others to misrepresent, information about its market and account manipulation during live trading.

96.     Defendant's deceptive acts and practices are of a recurring nature directed at consumers.

97.     Defendant's deceptive acts and practices have a broad, uniform impact on consumers at large.

98.     Defendant's deceptive acts and practices are materially deceptive and misleading.

99.     Plaintiff and Class Members have been injured, and are continuing to be injured, as a direct and proximate result of Defendant's deceptive acts and practices.

<u>COUNT III</u>
**VIOLATION OF NEW YORK GENERAL BUSINESS LAW 350**

100.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 49 as if fully set forth herein.

101.    As described herein, Defendant has engaged, and continues to engage, in unfair or deceptive acts or practices in the conduct of business, trade or commerce, or in the furnishing of services, that resulted in injury to Plaintiff and Class Members.

102.    Defendant has engaged, and continues to engage, in the above-described uniform deceptive national advertising and marketing program, including widespread advertising campaigns, promotions, seminars, press releases, "consumer-oriented" statements and advertising within its website, including by use of the Demo Account described herein.

103.    Plaintiff and Class Members reasonably relied, and continue to reasonably rely, upon the skill and judgment of Defendant, its agents, servants, and employees, and the representations and claims made by Defendant in its uniform deceptive national advertising and marketing campaigns and its representations made during live trading.

104.    Defendant's deceptive acts and practices are of a recurring nature and are directed at consumers.

105.    Defendant's deceptive acts and practices have a broad, uniform impact on consumers at large.

106.    Defendant's deceptive acts and practices are materially deceptive and misleading.

107.    Plaintiff and Class Members have been, and continue to be, injured as a direct and proximate result of Defendant's deceptive acts, practices and advertisements.

<u>COUNT IV</u>
**BREACH OF CONTRACT**

108.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 49 as if fully set forth herein.

109.    Defendant entered into agreements with Plaintiff and Class Members to trade on Defendant's forex trading platforms.

110.    Plaintiff and Class Members have fully performed all of their obligations under the respective customer agreements, except to the extent that such performance has been excused, prevented, hindered, frustrated and/or rendered useless by the acts and omissions of Defendant.

111.    As described herein, Defendant has failed to fully perform its obligations under the respective customer agreements.

112.    In the relevant customer agreements, Defendant notes that all Market Orders and non-Market Orders are accepted by FXDD and undertaken on a "Best Efforts Basis." Through its deceptive and manipulative trading practices described herein,

including intentional manipulation of its trading platforms, Defendant has failed to fully perform this obligation under the contract.

113.    In the relevant customer agreements, Defendant notes that its prices, bid/ask spreads and liquidity will reflect the prevailing interbank market liquidity for FXDD. Through its deceptive and manipulative trading practices described herein, including intentional manipulation of its trading platforms, Defendant has failed to fully perform this obligation under the contract.

114.    In the relevant customer agreements, Defendant notes that it expressly prohibits direct or indirect use directly or indirectly use any device, software or other artifice to manipulate or attempt to manipulate the functioning of any electronic system, data feed, software, connection speed or other interface, device or software of any type or kind made available by FXDD in connection with trading on any trading platforms made available by FXDD. Through its deceptive and manipulative trading practices described herein, including intentional manipulation of prices, execution and trading platforms, Defendant has failed to fully perform this obligation under the contract.

115.    Defendant has breached the above respective customers agreements as a result of its deceptive, fraudulent and manipulative business practices described herein.

116.    As a direct and proximate result of Defendant's breach of contract, Plaintiff and Class Members have suffered damages in an amount to be proven at trial.

## COUNT V
## BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

117.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 49 as if fully set forth herein.

118.   A covenant of good faith and fair dealing in the course of contract performance is implicit in all contracts.

119.   The purpose of the implied covenant of good faith is to further an agreement by protecting the promisee against a breach of the reasonable expectations and inferences otherwise derived from the agreement.

120.   The covenant of good faith and fair dealing protects the bargained-for terms of the agreement.

121.   During the Class Period, Defendant entered into a contract with Plaintiff and Class Members relating to trading on Defendant's forex trading platforms.

122.   The bargained for terms of the subject customer agreements included an agreement made by defendant to engage in good faith practices on its trading platforms and to present a reliable trading platforms where consumers can execute trades, free of manipulation and deception by Defendant.

123.   In contravention of these bargained for terms, Defendant engaged in various unscrupulous acts with a purpose of defrauding its customers by accepting funding for foreign currency trading and misappropriating or manipulating the amounts invested, while hiding behind auspices of a "disclaimer" buried inside lengthy, incomprehensive computer generated customer agreements.

124.   By reason of Defendant's above-described conduct, Defendant has breached the covenant of good faith and fair dealing causing Plaintiff and Class Members substantial harm.

125.   Plaintiff and Class Members have fully performed all of their obligations under the customer agreements, except to the extent that such performance has been

excused, prevented, hindered, frustrated and/or rendered useless by the acts and omissions of Defendant.

126.   As described above, Defendant has failed to perform its obligations under the customer agreements as a result of its deceptive, fraudulent and manipulative business practices described herein.

127.   As a direct and proximate result of Defendant's breach of the implied covenant of good faith and fair dealing, Plaintiff and Class Members have suffered damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff, Hugo Cruz, on behalf of himself and all others similarly situated, prays for judgment and relief on all Counts against Defendant, FXDD, as follows:

A.  That an Order be entered certifying that the action may be maintained as a class action;

B.  That temporary or preliminary injunctive relief be granted, pending final adjudication and the ordering of permanent relief:

    a.  Enjoining FXDD from pursuing the policies, acts, and practices complained of herein; and

    b.  Providing restitution to all customers who were subjected to FXDD's wrongdoing;

C.  That permanent injunctive relief be granted enjoining FXDD from pursuing the policies, acts, and practices complained of herein and ordering restitution to customers;

D.  That judgment be entered against FXDD for compensatory damages, plus treble damages for FXDD's violations of Civil RICO as provided by 18 U.S.C. § 1964(c);

E.  That reasonable attorney's fees be awarded;

F.  That the costs of this litigation be awarded; and

G.  That such other and further relief as the Court may deem necessary or appropriate be ordered.

**MORGAN & MORGAN, P.A.**
**Business Trial Group**

By: *Tucker H. Byrd Fon*
Tucker H. Byrd, Esq. (Lead Trial Counsel)
Florida Bar No. 381632
*Pending Pro Hac Vice Application*
20 N. Orange Avenue, Suite 1600
Orlando, FL 32801
Telephone: 407-244-9494
Facsimile: 407-418-2048
Email: TByrd@BusinessTrialGroup.com

James S. Byrd, Jr., Esq.
Florida Bar No. 539104
*Pending Pro Hac Vice Application*
20 N. Orange Avenue, Suite 1600
Orlando, FL 32801
Email: JByrd@BusinessTrialGroup.com

Damien H. Prosser Esq.
Florida Bar No. 0017455
*Pending Pro Hac Vice Application*
20 N. Orange Avenue, Suite 1600
Orlando, FL 32801
Email: DProsser@businesstrialgroup.com

Rachel Soffin, Esq.
Florida Bar No. 0018054
One Tampa City Center
201 N. Franklin Street
Tampa, FL 33602
Email: rsoffin@forthepeople.com

**MORGAN & MORGAN, P.A.**
**Business Trial Group**

By: *(signature)*
J. Carlos Real, Esq.
New York Reg. No. 4147310
20 N. Orange Avenue, Suite 1600
Orlando, FL 32801
Email: Creal@BusinessTrialGroup.com

Scott Wm. Weinstein, Esq.
Florida Bar No. 563080
12800 University Drive, Suite 600
Fort Myers, FL 33907-5337
Email: sweinstein@forthepeople.com

J. Andrew Meyer, Esq.
Florida Bar No. 56766
One Tampa City Center
201 N. Franklin Street
Tampa, FL 33602
Email: ameyer@forthepeople.com

Tamra Givens, Esq.
Florida Bar No. 657638
One Tampa City Center
201 N. Franklin Street
Tampa, FL 33602
Email: tgivens@forthepeople.com

Dated this **10**<sup>th</sup> day February, 2011.