UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
HUGO CRUZ, on behalf of himself
and all others similarly situated,

                              Plaintiff,

                   - against -

FXDirectDealer, LLC (FXDD),

                             Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: February 29, 2012

11 Civ. 1008 (PAC)

OPINION & ORDER

HONORABLE PAUL A. CROTTY, United States District Judge:

      Plaintiff filed an Amended Class Action Complaint on May 31, 2011, alleging that Defendant FXDirectDealer, LLC ("FXDD"), a foreign currency trading service, executed a fraudulent scheme to loot its customers' accounts by manipulating trades and pricing information through its computer software. Plaintiff asserts five claims against FXDD for violations of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961 et seq.; the New York General Business Law §§ 349 and 350; breach of contract; and breach of the implied covenant of good faith and fair dealing. Plaintiff seeks compensatory and treble damages under 18 U.S.C. § 1964(c), injunctive and declaratory relief pursuant to 18 U.S.C. § 1964(a), and attorney's fees and costs.

      On August 22, 2011, FXDD moved to dismiss, pursuant to Fed. R. Civ. P. 12(b)(6), arguing that Plaintiff's RICO claim fails because (1) Plaintiff has not satisfied the standard under Fed. R. Civ. P. 9(b) to plead the predicate acts of mail and wire fraud with particularity; (2) Plaintiff fails to allege a RICO enterprise distinct from the RICO "person"; (3) Plaintiff has no standing under RICO because he does not allege how the scheme caused his losses; and (4)

Plaintiff's claims are barred by the applicable four-year statute of limitations. FXDD also contends that Plaintiff's four state law claims fail as a matter of law. For the reasons discussed below, the Court grants FXDD's motion to dismiss the Amended Complaint.

## BACKGROUND

Defendant FXDD[1] provides online off-exchange foreign exchange ("Forex") trading and related services to retail, institutional, and individual customers. (Am. Compl. ¶ 11.) The Forex market is a worldwide, off-exchange financial market for the trading of currencies. (Id. ¶ 14.) Trades typically occur between large, institutional investors on the "interbank market," rather than on a regulated exchange. (Id. ¶ 15.) With the rise of online trading systems, individual investors may now trade in the Forex market via retail brokers such as FXDD. (Id. ¶ 16.) Plaintiff Hugo Cruz, an individual investor, alleges that he entered into a contractual agreement (the "Customer Agreement")[2] with FXDD in or around September/October 2006 to trade on FXDD's Forex platform. (Id. ¶ 46.)

As part of its marketing strategy, FXDD allows potential customers to simulate trading activity through "Demo," "Paper Trading," or "Practice Accounts" (the "Demo Account") without any financial risk. (Id. ¶ 19.) Before trading on FXDD's platform, customers must acknowledge that they have "conducted simulated trading using the [FXDD] Demo Trading Platforms . . . ." (Id.) Plaintiff alleges that before this action was filed, the FXDD website stated that "[t]he demo accounts for both platforms mirror exactly what you will see if you sign-up for a live account, and [t]he pricing and spreads are the same in demo and in live accounts." (Id.)

---

[1] FXDD was formed in 2002 as a joint venture between Tradition (North America, Inc.) ("Tradition") and Advanced Technologies Group, Ltd. ('ATG'). (Am. Compl. ¶ 57.) ATG sold its trading platform to FXDD in exchange for a 25% share in FXDD. (Id.) FXDD remains a subsidiary of Tradition. (Id. ¶ 58.)

[2] The Customer Agreement signed by Plaintiff Hugo Cruz is attached as Exhibit C to the Declaration of Jeffrey Burke ("Burke Decl."). In deciding a motion to dismiss pursuant to Rule 12(b)(6), this Court may consider "documents attached to the complaint as an exhibit or incorporated in it by reference, . . . matters of which judicial notice may be taken, [and] documents either in plaintiffs' possession or of which the plaintiffs had knowledge and relied on in bringing suit." Brass v. Am. Film Techs., Inc., 987 F.2d 142, 150 (2d Cir. 1993).

(emphasis removed).  After Plaintiff filed his initial complaint, FXDD allegedly modified this statement to read: "The pricing on the demo platforms, while indicative of live pricing, is not a mirror image of what you will see if you sign up for a live account."  (Id.) (emphasis removed).

    A.  The Alleged Dishonest Trading Practices

Plaintiff contends that FXDD "engages in a series of dishonest trade execution practices that are never disclosed to customers."  (Id. ¶ 22.)  Specifically, the Amended Complaint alleges that FXDD's actual trading platforms are a "rigged game" controlled by "sophisticated back-end administrative consoles" that allow Defendant "to interfere with and manipulate customers' trades so as to systematically 'loot' customers' accounts . . . ."  (Id. ¶¶ 22, 24.)

Plaintiff alleges that FXDD's dishonest trading practices include the following, among others:  (1) routing customer accounts to slow servers during profitable trading activity, thus "allowing Defendant the time to hijack any potential profit in the trade by buying and selling in-between the customer's order and the real market"; (2) generating false "error" messages, "slow fill" or "no fill" messages to prevent the customer from closing out a profitable trade while generating "illicit profits" for FXDD; (3) creating artificial short term price spikes to trigger a customer's stop order and pirate the customer's profits, a practice known as "stop hunting" or "stop loss hunting"; (4) taking advantage of the change in price between the time when a price is quoted and a market order is placed, known as "slippage"; and (5) targeting trades of profitable customers using any combination of these tactics.  (Id. ¶ 25.)  Plaintiff alleges that these practices "were inherently self-concealing," and that he and other proposed Class Members[3] suffered

---

[3] Plaintiff's proposed class includes "[a]ll persons in the United States who contracted with Defendant to trade foreign currencies on Defendant's over-the counter, off-exchange, trading platforms from January 1, 2005 to present, and whose accounts were subjected to Defendant's fraudulent and unfair trade execution and account handling practices . . . ."  (Am. Compl. ¶ 28.)

damages as a direct and proximate result. (Id. ¶¶ 27, 38.) During the two years that Plaintiff traded on FXDD's Forex platform, he allegedly lost approximately $281,170.24. (Id. ¶ 48.)

    B.  Alleged RICO Violation

Count 1 of the Amended Complaint asserts that FXDD conducted the affairs of the "FXDD Fraud Enterprise" through a "pattern of racketeering activity" in violation of 18 U.S.C. § 1962(c). (Id. ¶ 50.) Plaintiff alleges that FXDD and the members of the FXDD Fraud Enterprise committed predicate acts of mail and wire fraud in order to execute their scheme.

    1.  The FXDD Fraud Enterprise

Plaintiff alleges that beginning in "at least October 2002," FXDD formed an enterprise with various entities and individuals to commit the alleged RICO violations. (Id. ¶¶ 66, 72.) The members of the enterprise included: FXDD and certain of its individual executives, COO Lubomir Kaneti and Managing Director and Corporate Counsel James E. Green[4]; Tradition, FXDD's parent company, and ATG, both of whom allegedly provided financial and professional assistance to FXDD during its start-up phase; certain software companies, such as MetaQuotes and Currenex, that develop trade platforms and applications used by FXDD; additional software companies and individual programmers that aided FXDD in developing its proprietary trading platforms; and brokers who received commissions from FXDD in exchange for providing Forex educational services to consumers and for "steering" or introducing customers to FXDD's service (the "Introducing Brokers"). (Id. ¶ 56(a)-(g).) According to the Amended Complaint, the "overarching purpose" of the FXDD Fraud Enterprise "is for each of its members to profit from customers opening Live Accounts with [FXDD]." (Id. ¶ 73.)

Plaintiff contends that this "FXDD Fraud Enterprise" is an association in fact within the meaning of 18 U.S.C. § 1961(4), and that it "consists of a group of 'persons' associated together

---

[4] Neither Kaneti nor Green are named as individual defendants in this action.

for the common purpose of employing the multiple deceptive, abusive and fraudulent acts" alleged in the Amended Complaint. (Id. ¶ 66.) Specifically, Plaintiff alleges that FXDD worked with the other members of this enterprise "to design, customize, and employ specialized trading platforms and Application Programming Interface software ("API") that allows [FXDD] to dishonestly manipulate the trade execution process" in order to generate profits "at the expense of [FXDD's] customers." (Id. ¶ 67.) FXDD's alleged dishonest trading practices are "in furtherance of the goals of the FXDD Fraud Enterprise," and these practices continue as the members of the enterprise maintain and upgrade the software used by FXDD's trading platform. (Id.)

The Amended Complaint alleges that the FXDD Fraud Enterprise forms a hierarchy with Kaneti, Green, and Tradition at the top. Kaneti and Green oversee FXDD's day-to-day financial operations, "including implementation and supervision of the deceptive trading practices" alleged. (Id. ¶ 68.) Tradition lent FXDD start-up funding as well as reputational capital "as a world leader in the brokerage and trading of financial and non-financial products to induce trust and reliance" on FXDD's trading service. (Id. ¶ 69.) ATG also provided start-up capital and helped Tradition promote FXDD to consumers. (Id. ¶ 70.) The Introducing Brokers are at the foot of the hierarchy and, according to Plaintiff, are not aware of FXDD's dishonest trading practices. (Id. ¶ 71.) Nevertheless, the Introducing Brokers continue to bring additional customers to FXDD and "predictab[ly] pass[] on and repeat[] the various fraudulent statements of [FXDD]," thus "bolstering the believability of [FXDD's] false statements" and furthering the goals of the enterprise. (Id.)

2. Predicate Acts

The Amended Complaint alleges that FXDD committed RICO predicate acts of mail and wire fraud in the course of conducting its pattern of racketeering activity.

(a) Mail Fraud

Plaintiff alleges that FXDD violated the mail fraud statute, 18 U.S.C. § 1341, by mailing customer agreements that contained incomplete risk disclosures, which omitted the true nature of FXDD's allegedly deceptive and fraudulent practices. (Am. Compl. ¶ 75.) The risk disclosures represented that: (1) FXDD acted as "a counterparty" or "opposing principal broker" in customers' transactions; (2) Forex trading entails liquidity risks, possible "fast market" conditions, and technology risks "inherent in trading online"; and (3) FXDD accepts and undertakes all orders on a "Best Efforts Basis." (Id. ¶ 75(a)(i)-(iii).) Plaintiff contends that each of these disclosures "failed to express the actual risks attendant with using FXDD's foreign exchange trading services," specifically the alleged deceptive trading practices. (Id. ¶ 75.)

(b) Wire Fraud

Plaintiff's Wire Fraud allegations fall into two categories: (1) dissemination of marketing materials and advertisements for FXDD's trading service and Demo Account from January 5, 2005 through approximately January 31, 2011; and (2) the payments and transfers of proceeds from the "improper marketing scheme." (Id. ¶ 75(b), (c).)

The Amended Complaint lists fifteen separate categories of marketing activity and specific statements alleged to have violated the Wire Fraud statute, 18 U.S.C. § 1343. These include, among others: advertisements on FXDD's website stating that FXDD "Does Not Trade Against Their Clients, but Facilitates Trade Via Transparent Real-Time Bid/Offer Pricing," (id. ¶ 75(b)(i)); repeated advertisements that FXDD offers "[t]ransparent and consistent interbank

pricing and liquidity," (id. ¶ 75(b)(iv)-(v)); statements that customer trades and orders "will be handled quickly and professionally. Market orders are filled instantaneously at the rate you request, with no manual dealer intervention or slippage," (id. ¶ 75(b)(viii)); promotional materials for Demo Accounts that specifically target college students, (id. ¶ 75(b)(xi)); and statements in a PRNewswire.com article about the ability of its trading platform, MetaTrader 4, to execute trades "without any intervention by anyone at FXDD." (Id. ¶ 75(b)(xiv)(2).) Plaintiff alleges that these and other representations failed to express "the actual risks" associated with using FXDD's trading service. (Id. ¶ 75(b).)

According to the Amended Complaint, these alleged acts of Mail and Wire Fraud "were knowing and intentional, and made with the intent to create and manage [FXDD's] scheme to defraud and manipulate customers." (Id. ¶ 76.) Plaintiff alleges that he and Class Members reasonably relied on FXDD's false statements "by continuing to invest money with [FXDD] and not taking immediate action to close their accounts and demand the return of their investments." (Id. ¶ 77.) Plaintiff contends that the alleged Mail and Wire Fraud violations constitute a "pattern of racketeering activity" as defined in 18 U.S.C. § 1961(5) "because such predicate acts were related to each other in that they were committed as part of an illegal and fraudulent marketing scheme to defraud and steal money from customers." (Id. ¶ 78.)

    C.  State Law Claims

Counts Two through Five assert state law claims under the New York General Business Law as well as contract law. Count Two alleges that FXDD violated N.Y. Gen. Bus. Law § 349 by engaging in unfair or deceptive acts or practices that resulted in injury to Plaintiff and Class Members. (Am. Compl. ¶¶ 94, 99.) Count Three includes a related cause of action for false advertising under N.Y. Gen. Bus. Law § 350. Count Four alleges breach of contract based on the

relevant customer agreements entered into between FXDD and Plaintiff and Class Members. Specifically, Plaintiff alleges that FXDD breached those agreements by: (1) failing to execute all customer orders on a "Best Efforts Basis"; (2) failing to ensure that FXDD's prices, bid/ask spreads and liquidity reflect the prevailing interbank market liquidity for FXDD; and (3) failing to prohibit direct or indirect manipulation of electronic systems, software, and other devices made available by FXDD in connection with its trading platforms.  (Id. ¶¶ 112-114.) Lastly, Count Five alleges that FXDD breached the covenant of good faith and fair dealing by "engage[ing] in various unscrupulous acts with a purpose of defrauding [FXDD's] customers." (Id. ¶ 123.)

## DISCUSSION

A. Motion to Dismiss Standard

When considering a motion to dismiss under Fed.R.Civ.P. 12(b)(6), the Court assumes all facts alleged in the complaint to be true, and draws all reasonable inferences in favor of the plaintiff.  Kassner v. 2nd Ave. Delicatessen, Inc., 496 F.3d 229, 237 (2d Cir. 2007). Nevertheless, simply chanting the elements of a cause of action, "supported by mere conclusory statements, do not suffice. . . .  While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." Ashcroft v. Iqbal, 556 U.S. 662, 129 S.Ct. 1937, 1949-50 (2009).  To avoid dismissal, the complaint must contain "enough facts to state a claim to relief that is plausible on its face [and] nudge[] [the plaintiff's] claims across the line from conceivable to plausible. . . ." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).

B. RICO Violation – 18 U.S.C. § 1962(c)

The RICO statute makes it unlawful "for any person employed by or associated with any enterprise . . . to conduct or participate . . . in the conduct of such enterprise's affairs through a

pattern of racketeering activity . . . ." 18 U.S.C. § 1962(c).  The statute defines "racketeering activity" in § 1961(1) as including "any act which is indictable under" specified provisions of title 18.  Id. § 1961(1).  Mail and wire fraud are among the offenses included within this definition.  See id.

To establish a RICO claim, and a right to treble damages under the statute, a plaintiff must show: "(1) a violation of the RICO statute, 18 U.S.C. § 1962; (2) an injury to business or property; and (3) that the injury was caused by the violation of § 1962."  De Falco v. Bernas, 244 F.3d 286, 305 (2d Cir. 2001); see also 18 U.S.C. § 1964(c) (to have a remedy under RICO, a plaintiff must be "injured in his business or property by reason of a violation of section 1962").

To establish a violation of 18 U.S.C. § 1962(c), in turn, a plaintiff must show "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity."  De Falco, 244 F.3d at 306 (citing Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496 (1985)).  A "pattern" of racketeering activity requires the commission of at least two predicate acts listed under § 1961(1).  See 18 U.S.C. § 1961(5).

1. Allegations of Predicate Acts Insufficient

FXDD argues that Plaintiff has failed to satisfy the requirement under Fed.R.Civ.P. 9(b) of pleading mail and wire fraud with particularity, and that "[n]owhere in the Amended Complaint . . . does Plaintiff indicate how—or even whether—FXDD's alleged mail and wire fraud specifically misled him."  (Def's Mem. at 11.)

To plead mail or wire fraud as a predicate act, a plaintiff must allege:  "(1) the existence of a scheme to defraud, (2) the defendant's knowing or intentional participation in the scheme, and (3) the use of interstate mails or transmission facilities in furtherance of the scheme."  S.Q.K.F.C., Inc. v. Bell Atl. TriCon Leasing Co., 84 F.3d 629, 633 (2d Cir. 1996).  In addition,

9

"materiality of falsehood is also an element of the federal mail fraud [and] wire fraud" statutes. Neder v. United States, 527 U.S. 1, 25 (1999). A complaint alleging RICO violations based on mail or wire fraud must allege that the defendant participated in at least two acts of mail or wire fraud. See First Interregional Advisors Corp. v. Wolff, 956 F. Supp. 480, 485 (S.D.N.Y. 1997).

Furthermore, these allegations must meet the rigorous pleading requirements of Federal Rule of Civil Procedure 9(b). See First Capital Asset Mgmt. Inc. v. Satinwood, Inc., 385 F.3d 159, 178-79 (2d Cir. 2004). "In the RICO context, Rule 9(b) calls for the complaint to specify the statements it claims were false or misleading, give particulars as to the respect in which plaintiffs contend the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements." Moore v. PaineWebber, Inc., 189 F.3d 165, 173 (2d Cir. 1999). Although a RICO plaintiff need not plead particularity if the complaint alleges that the mails or wires were "simply used in furtherance of a master plan to defraud," where the complaint alleges "that the mailings themselves were fraudulent, i.e., that the mailings themselves contained false or misleading information," a plaintiff must satisfy Rule 9(b). In re Sumitomo Copper Litig., 995 F. Supp. 451, 456 (S.D.N.Y. 1998).

The Rule 9(b) requirements are triggered here, as Plaintiff asserts that the Customer Agreements mailed by FXDD were fraudulent because they included "deceptive information," and failed to disclose the "actual risks" of trading with FXDD. (Am. Compl. ¶ 75(a).) These allegations fail to satisfy Rule 9(b). As indicated in the Amended Complaint, the customer agreements included extensive risk disclosures, including warnings about investment risk and "a technology risk inherent in trading online or via a software application and the Customer accepts that risk." (Id. ¶ 75(a)(ii).) Indeed, the complete Customer Agreement signed by Plaintiff, provided by FXDD, includes a three-page section entitled, "FXDirectDealer Risk Disclosure

Statement." (Burke Decl., Ex. C, at 10-12.) The Risk Disclosure Statement indicates in boldface that "There is No Guarantee of Profit from Trading with FXDD," and that "There is No Guarantee that FXDD Will Be Able to Execute Stop Loss Orders, Limit Orders or OCO Orders at the Customer Entered Price." (Id. at 11.) Although Plaintiff contends that he is not required to allege reliance on a defendant's fraudulent misrepresentations to state a claim for mail or wire fraud, (Pl. Mem. at 5), Plaintiff must still demonstrate why the Customer Agreements and marketing statements were misleading in order to allege violations of 18 U.S.C. §§ 1341 and 1343. Plaintiff has not done so, and the allegations of predicate acts fail to support a violation of § 1962(c).

    2.   Existence of a Separate RICO Enterprise Not Established

FXDD argues that Plaintiff fails to allege a RICO enterprise because the "FXDD Fraud Enterprise" is not separate and distinct from the alleged pattern of racketeering activity. (Def's Mem. at 16.) FXDD also argues that the enterprise is not distinct from the RICO "person."

The RICO statute defines an "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). Although the concept of an association-in-fact enterprise is "expansive," the enterprise "must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." Boyle v. United States, 556 U.S. 938, 129 S.Ct. 2237, 2243-44 (2009); see also United States v. Turkette, 452 U.S. 576, 583 (1981) (stating that an association-in-fact enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct").

11

The enterprise must also satisfy two distinctness requirements. First, the enterprise "is an element distinct from the pattern of racketeering activity." Boyle, 129 S.Ct. at 2245 (citing Turkette, 452 U.S. at 583). "The 'enterprise' is not the 'pattern of racketeering activity'; it is an entity separate and apart from the pattern of activity in which it engages." Kottler v. Deutsche Bank AG, 607 F. Supp. 2d 447, 458 (S.D.N.Y. 2009). Second, the RICO "person"[5] who violates § 1962(c) must also be distinct from the enterprise. Cedric Kushner Promotions, Ltd. v. King, 533 U.S. 158, 161 (2001). "[§ 1962(c)'s] language, read as ordinary English, suggests that principle." Although "a corporate entity may not be both the RICO person and the RICO enterprise under section 1962(c)," a corporate entity may still be liable as a RICO defendant under § 1962(c) "where it associates with others to form an enterprise that is sufficiently distinct from itself." Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A., 30 F.3d 339, 344 (2d Cir. 1994).[6]

The Amended Complaint does not allege that its constituent members "existed as an association-in-fact separate and apart from the alleged RICO activity, but rather that they came together strictly for the purpose of" facilitating FXDD's allegedly deceptive trading practices. Eaves v. Designs for Fin., Inc., 785 F. Supp. 2d 229 (S.D.N.Y. 2011). See also Kottler, 607 F. Supp. at 458-59 (dismissing RICO claim where "[t]he enterprise and the pattern . . . are one and the same; Defendants and co-conspirators joined forces for the purpose of creating these allegedly fraudulent tax shelters"). Indeed, the Amended Complaint alleges that the constituent

---

[5] § 1961(3) defines "person" as including "any individual or entity capable of holding a legal or beneficial interest in property." 18 U.S.C. § 1961(3).

[6] Plaintiff argues that the Supreme Court overruled Riverwoods, holding in Cedric Kushner that a corporation may be considered distinct from its employees for purposes of RICO liability. (Pl's Mem. at 8 (citing Cedric Kushner, 533 U.S. at 166).) Cedric Kushner involved allegations that a corporate employee was a RICO "person" and the corporation was the "enterprise." See 533 U.S. 164. The Court distinguished Riverwoods, explaining that Riverwoods "concerned the claim that the corporation was the 'person' and the corporation, together with all its employees and agents, were the 'enterprise.'" Id. The Court stated that it was not overruling Riverwoods and other decisions in line with its reasoning, but "note[d] only their distinction from the instant case." Id. Plaintiff's argument is therefore misplaced.

members of the FXDD Fraud Enterprise "associated together for the common purpose of employing the multiple deceptive, abusive and fraudulent acts" alleged. (Am. Compl. ¶ 66.) Plaintiff thus fails to allege that the FXDD Fraud Enterprise is sufficiently distinct from the alleged pattern of racketeering activity.

The Amended Complaint also fails to allege that the FXDD Fraud Enterprise is distinct from the RICO "person." Plaintiff alleges that the enterprise consisted of FXDD together with its corporate officers Kaneti and Green; Tradition and ATG; third party software companies and programmers; and the Introducing Brokers. (Am. Compl. ¶ 56(a)-(g).) In essence, the Amended Complaint alleges that FXDD, the only named defendant, acted through its agents, Kaneti and Green, to carry out the daily operations of running its Forex trading platform. These allegations do not meet the distinctness requirement under § 1962(c). See Riverwoods, 30 F.3d at 344 (distinctiveness requirement not satisfied where plaintiff "alleg[es] a RICO enterprise that consists merely of a corporate defendant associated with its own employees or agents carrying on the regular affairs of the defendant"); Reed Constr. Data Inc. v. McGraw-Hill Co., Inc., 745 F. Supp. 2d 343, 350 (2010) (dismissing RICO claim where plaintiff "failed to allege that [corporation], the 'person' named as Defendant, is distinct from the alleged 'enterprise'").

The additional members of the FXDD Fraud Enterprise do not cure this defect. Tradition as the corporate parent of FXDD is not a sufficiently distinct "person" from FXDD for purposes of liability under § 1962(c). See id. (holding that division of corporate defendant "cannot be considered distinct from the parent corporation"). Moreover, there are insufficient allegations that the remaining members of the FXDD Fraud Enterprise intended to participate in any racketeering scheme, or that they shared a common fraudulent purpose with the other alleged members of the enterprise. Indeed, with respect to the Introducing Brokers, Plaintiff alleges that

these independent third-parties "unwittingly" repeated FXDD's allegedly fraudulent statements to customers. "[F]or an association of individuals to constitute an enterprise, the individuals must share a common purpose to engage in a particular fraudulent course of conduct and work together to achieve such purposes." First Capital Asset Mgmt., Inc. v. Satinwood, Inc., 385 F.3d 159, 174 (2d Cir. 2004). Plaintiff has thus failed to allege an enterprise. Count One of the Amended Complaint is therefore dismissed with prejudice.

    C.    New York Gen. Bus. Law §§ 349 and 350

Plaintiff alleges that FXDD also engaged in unfair or deceptive acts or practices in violation of New York General Business Law § 349, the consumer protection statute, and § 350, the false advertising statute. FXDD argues that these claims fail because the allegedly deceptive acts did not take place in New York, and that Plaintiff has no standing.[7]

Both New York General Business Law § 349 (deceptive acts) and § 350 (false advertising) require that a defendant conduct activities "in this state." N.Y. Gen. Bus. Law §§ 349(a), 350. The reference in § 349(a) to deceptive practices in "'the conduct of any business, trade or commerce or in the furnishing of any service *in this state*' . . . unambiguously evinces a legislative intent to address commercial misconduct occurring within New York." Goshen v. Mutual Life Ins. Co. of New York 98 N.Y.2d 314, 324-325 (2002) (quoting N.Y Gen. Business Law § 349(a)). As a result, "to qualify as a prohibited act under the statute, the deception of a consumer must occur in New York." Id. at 325 (holding that alleged deception occurred in Florida, where plaintiff purchased the allegedly deceptive insurance policy and where plaintiff paid premiums); see also Christe v. Hotels.com L.P., 756 F. Supp. 2d 382, 403 (S.D.N.Y. 2010) (dismissing § 349 claim for lack of standing where allegedly deceptive practices occurred when

---

[7] FXDD argues that the Court must dismiss Plaintiff's state law claims for lack of subject matter jurisdiction to the extent that the Court dismisses Plaintiff's RICO claim. This argument is misplaced, as the Court has diversity jurisdiction over Plaintiff's remaining state claims.

plaintiffs made online hotel reservation outside New York). New York courts have applied this same standing requirement for claims under § 350. See People ex rel. Spitzer v. Direct Revenue, LLC, 19 Misc.3d 1124(A), at *7 (N.Y. Sup. Ct. 1st Dep't 2008).

Plaintiff alleges that he resided in Springfield, Virginia throughout the time period alleged in his Amended Complaint. (Am. Compl. ¶¶ 10, 12.) There are no allegations that any of FXDD's allegedly deceptive practices took place in New York, or that Plaintiff executed any Forex trades on FXDD's platform in New York.[8] Accordingly, Plaintiff has no standing under §§ 349 and 350 and Counts Two and Three are dismissed with prejudice.

D.  Breach of Contract

Count Four of the Amended Complaint alleges that FXDD, through its allegedly fraudulent, deceptive, and manipulative trading practices, breached the relevant customer agreements by (1) failing to execute all customer orders on a "Best Efforts Basis"; (2) failing to ensure that FXDD's prices, bid/ask spreads and liquidity reflect the prevailing interbank market liquidity for FXDD; and (3) failing to prohibit direct or indirect manipulation of electronic systems, software, and other devices made available by FXDD in connection with its trading platforms. (Am. Compl. ¶¶ 112-114.) FXDD argues that the customer agreements expressly disclaim liability for failing to take orders on a "Best Efforts Basis" and that the agreements disclosed investment risk.

To state a claim for breach of contract under New York law, a plaintiff must allege the existence of a valid contract, plaintiff's performance of his obligations pursuant to the contract, the basis for defendant's breach, and resulting damages. Morris v. 702 E. Fifth St. HDFC, 850 N.Y.S.2d 6, 7 (N.Y. App. Div. 1st Dep't 2007). "The claim cannot withstand a motion to

---

[8] Plaintiff argues that FXDD's standing argument is "irrelevant" because of the New York choice of law provision in the parties' Customer Agreement. Plaintiff cites no law to support its contention that a choice of law provision controls this Court's standing analysis under New York law.

dismiss if the express terms of the contract contradict plaintiff's allegations of breach." Merit Grp., LLC v. Sint Maarten Int'l Telecomm. Servs., NV, No. 08 Civ. 3496, 2009 WL 3053739, at *2 (S.D.N.Y. Sept. 24, 2009).  The provisions of the Customer Agreement "establish the rights of the parties and prevail over conclusory allegations of the complaint." 805 Third Ave. Co. v. M.W. Realty Assoc., 58 N.Y.2d 447, 451 (1983).

Here, the Customer Agreement discloses the high-risk nature of Forex trading[9] and states, in boldface, that "FXDD makes no warranty expressed or implied; that *Bid and Ask Prices* shown represent prevailing bid and ask prices in the interbank market."  (Burke Decl. Ex. C ¶ 7.2.)  FXDD further represented that "because of a number of factors including but not limited to technology failures, communication system delays, lack of interbank liquidity or high market volatility, FXDD makes no warranties that dealing prices and liquidity will be available continuously to Customers . . . ."  (Id.) (emphasis removed).  Although the agreement provides that FXDD "will reasonably attempt to execute all *Orders* that it may, in its sole discretion, accept from Customer," under the agreement, FXDD "shall not be responsible for any loss or damage caused, directly or indirectly, by any events, actions or omissions beyond the reasonable direct control of FXDD," including losses resulting "from any delays or inaccuracies in the transmission of Orders and/or information due to a breakdown in or failure of any transmission or communication facilities."  (Id. ¶ 7.3.)  FXDD's representation that it would undertake orders on a "best-efforts-basis" was also qualified in the customer agreement, which states:  "The Customer acknowledges . . . that due to market conditions or other circumstances, FXDD may be unable to execute the Order at the Market or specified level and the Customer agrees that FXDD

---

[9] The risk acknowledgments of the Customer Agreement provide in part that the customer "acknowledges and understands that trading and investment in leveraged OTC Foreign Currency Contracts is highly speculative, involves an extreme degree of risk, and is generally appropriate only for persons who can assume risk of loss in excess of their Margin deposit."  (Burke Decl. Ex. C ¶ 4.)

will bear no liability for failure to execute such orders." (Id.) (emphasis removed). A three-page Risk Disclosure disclaims any guarantee of profit from trading with FXDD, or that FXDD will be able to execute orders at the customer entered price. (Burke Decl. Ex. C at 10-12.) Since these representations expressly contradict Plaintiff's allegations of breach, Count Four must be dismissed with prejudice.

      E.      Covenant of Good Faith and Fair Dealing

"Implicit in all contracts is a covenant of good faith and fair dealing in the course of contract performance." Dalton v. Educ. Testing Serv., 87 N.Y.2d 384, 389 (1995). A claim for breach of the duty of good faith and fair dealing does not provide a cause of action separate from a breach of contract claim, however. See, e.g., Harris v. Provident Life & Accident Ins. Co., 310 F.3d 73, 80-81 (2d Cir. 2002). As a result, "[a] claim for breach of the implied covenant will be dismissed as redundant where the conduct allegedly violating the implied covenant is also the predicate for breach of covenant of an express provision of the underlying contract." ICD Holdings S.A. v. Frankel, 976 F. Supp. 234, 243–44 (S.D.N.Y.1997) (dismissing claim for breach of implied covenant of good faith and fair dealing where the claim "rest[ed] entirely on the breaches of the purchase agreement alleged in the first claim for relief").

Such is the case here. Plaintiff's allegations in Count Five are based on the same allegations that underlie the breach of contract claim—namely that FXDD "engaged in various unscrupulous acts" to misappropriate and manipulate customers' investments. (Am. Compl. ¶ 123.) As Plaintiff does not base this claim on any new facts, Count Five is redundant of Plaintiff's breach of contract claim and is dismissed with prejudice.

## CONCLUSION

For the foregoing reasons, Count One of the Amended Complaint alleging a violation of the RICO statute is dismissed with prejudice for failure to allege predicate acts and the existence of an enterprise. Counts Two and Three alleging violations of N.Y. Gen. Bus. Law §§ 349-350 are dismissed with prejudice for lack of standing. Counts Four and Five alleging breach of contract and breach of the covenant of good faith and fair dealing are dismissed with prejudice for failure to state a claim. Plaintiff's request for attorney's fees and costs is denied. The Clerk is directed to enter judgment and terminate this case.

Dated: New York, New York
      February 29, 2012

SO ORDERED

_____
PAUL A. CROTTY
United States District Judge